SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

State v. S.S. (A-84-15) (077486)

Argued February 27, 2017 -- Decided June 21, 2017

Albin, J., writing for the Court.

In this interlocutory appeal, the Court determines two issues: what is the appropriate standard of appellate review of a trial court's factual findings based solely on the court's viewing of a video-recorded police interrogation, and did defendant invoke his right to remain silent during the interrogation.

In 2011, defendant S.S. was tried before a jury and convicted of first-degree aggravated sexual assault of his six-year-old daughter and second-degree endangering the welfare of his child. The Appellate Division reversed those convictions for reasons unrelated to this appeal and ordered a new trial.

Before the start of the second trial, defendant moved for the first time to suppress incriminating video-recorded statements he made to investigators in the Hudson County Prosecutor's Office, claiming that investigators failed to honor his invocation of his right to silence in violation of Miranda.

Sergeant Kolich and Detective Hans interrogated defendant in the Hudson County Prosecutor's Office. For approximately forty-seven minutes, Detective Hans conducted the interrogation alone. In response to Detective Hans's questions, defendant repeatedly denied that he had abused his daughter. After Sergeant Kolich entered the interview room, the questioning became increasingly accusatory. Sergeant Kolich repeatedly made the misrepresentation that defendant's daughter told the investigators that defendant put his penis in her mouth. Sergeant Kolich, again and again, accused defendant of lying. A little more than one hour into the interrogation, Sergeant Kolich said "[T]here's something inside you you want to say, and you're fighting it. You're fighting it." Defendant replied, "No, that's all I got to say. That's it."

The interrogation proceeded, and defendant continued to suggest that he did not want to speak. Eventually, he indicated that "it happened" when, after a shower, he was drying himself and his daughter entered the bathroom.

In ruling on the motion, the trial court relied solely on its review of the video-recorded interrogation. Because it found that defendant invoked his right to remain silent under Miranda when he said, "No, that's all I got to say. That's it," the court entered an order suppressing all statements made after that point in the interrogation.

The Appellate Division granted the State's motion for leave to appeal, and a two-member panel reversed the trial court's order. The panel noted that it defers to a "trial court's findings of fact that are supported by sufficient credible evidence in the record" when the suppression hearing involves the taking of witness testimony. The panel stated, however, that such deference is not required when "the trial court's factual findings are based only on its viewing of a recorded interrogation that is equally available to the appellate court," quoting State v. Diaz-Bridges, 208 N.J. 544, 566 (2011). Relying on Diaz-Bridges, the panel engaged in a de novo review of the video-recorded interrogation. The panel determined that, based on its "independent review of the video," the State had proven beyond a reasonable doubt that defendant never revoked his initial waiver of his right to remain silent.

The Court granted defendant's motion for leave to appeal. 226 N.J. 207 (2016).

HELD: After a careful reappraisal of Diaz-Bridges, the Court now holds that the non-deferential standard articulated in that case is at odds with traditional principles limiting appellate review. An appellate court ordinarily should defer to a trial court's factual findings, even when those findings are based solely on its review of a video recording. Deference, however, is not required when the trial court's factual findings are clearly mistaken. Here, sufficient credible evidence in the record supports the factual finding that defendant invoked his right to silence during the interrogation.

1

1. Generally, on appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when those findings are supported by sufficient credible evidence in the record. The issue here, however, concerns the level of deference owed to a trial court's factual findings based solely on its review of a video recording or documentary evidence. That issue arose in Diaz-Bridges, supra, where the Court expressed its view that a reviewing court need not give deference to another court's factual findings based solely on a video-recorded interrogation, stating: "When the trial court's factual findings are based only on its viewing of a recorded interrogation that is equally available to the appellate court and are not dependent on any testimony uniquely available to the trial court, deference to the trial court's interpretation is not required." 208 N.J. at 566. (pp. 16-19)

2. Federal courts, and a number of state courts, have adopted a standard of appellate review that requires deference to a trial court's factual findings when those findings are based on viewing a video-recorded interrogation or search. The policy reasons for a deferential approach are set forth in Anderson v. City of Bessemer City, 470 U.S. 564, 574-75 (1985): "The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources." The Anderson Court adopted a clearly erroneous standard of review. Federal Rule of Civil Procedure 52(a)(6) was amended the same year that the United States Supreme Court released its decision in Anderson. The Advisory Committee rejected "a more searching appellate review" in favor of a "clearly erroneous" standard for "documentary evidence." Several United States Courts of Appeals have applied a deferential standard in reviewing factual findings based on video evidence. Several state jurisdictions also utilize a deferential standard in reviewing a trial court's factual findings based on video evidence. In contrast, a number of jurisdictions favor a de novo approach. (pp 19-24)

3. The Court now concludes that a standard of deference to a trial court's factfindings, even factfindings based solely on video or documentary evidence, best advances the interests of justice in a judicial system that assigns different roles to trial courts and appellate courts. The Court rejects the de novo standard introduced in Diaz-Bridges. A policy of deferring to findings of fact of a trial court based on its review of video and documentary evidence has certain tangible benefits. When more than one reasonable inference can be drawn from the review of a video recording, a trial court's factual conclusions reached by drawing permissible inferences cannot be clearly mistaken, and the mere substitution of an appellate court's judgment for that of the trial court's advances no greater good. Permitting appellate courts to substitute their factual findings for equally plausible trial court findings is likely to "undermine the legitimacy of the [trial] courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority." See Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment. Acknowledging that a trial court's factual findings are entitled to deference does not mean that appellate courts must give blind deference to those findings. Deference ends when a trial court's factual findings are not supported by sufficient credible evidence in the record. (pp. 24-28)

4. Under the United States Supreme Court's interpretation of the Fifth Amendment, the police are required to stop a custodial interrogation when a suspect unambiguously asserts his right to remain silent. In contrast, under New Jersey's privilege against self-incrimination, a request, however ambiguous, to terminate questioning must be diligently honored. If the police are uncertain whether a suspect has invoked his right to remain silent, two alternatives are presented: (1) terminate the interrogation or (2) ask only those questions necessary to clarify whether the defendant intended to invoke his right to silence. Words similar to those used by defendant here have been considered sufficient to invoke the right to silence. (pp. 28-32)

5. The trial court concluded that, based on its review of the entire video-recorded interrogation, "defendant unambiguously invoked his right to silence" from the point he stated, "that's all I got to say." The Appellate Division followed the guidance given in Diaz-Bridges and substituted its interpretation of the video in place of the trial court's reasoned analysis. The trial court's factual conclusions are supported by sufficient credible evidence in the record and therefore are not clearly mistaken. The Court affirms the trial court's suppression order. After defendant said, "No, that's all I got to say. That's it," his statements are inadmissible. (p. 32-34)

The judgment of the Appellate Division is **REVERSED**. The matter is **REMANDED** to the trial court for proceedings consisted with this opinion.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE ALBIN's opinion.**

2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

S.S.,

    Defendant-Appellant.


       Argued February 27, 2017 – Decided June 21, 2017

       On appeal from the Superior Court, Appellate
       Division.

       Joseph J. Russo, Deputy Public Defender,
       argued the cause for appellant (Joseph E.
       Krakora, Public Defender, attorney; Joseph
       J. Russo and Jessica L. Spencer, Assistant
       Deputy Public Defender, on the briefs).

       Sara M. Quigley, Deputy Attorney General,
       argued the cause for respondent (Christopher
       S. Porrino, Attorney General of New Jersey,
       attorney).

       Rebecca J. Livengood argued the cause for
       amicus curiae American Civil Liberties Union
       of New Jersey (Edward L. Barocas, Legal
       Director, attorney; Rebecca J. Livengood,
       Edward L. Barocas, Alexander Shalom, and
       Jeanne M. LoCicero, on the letter brief).

       John J. O'Reilly argued the cause for amicus
       curiae Association of Criminal Defense
       Lawyers of New Jersey (McElroy, Deutsch,
       Mulvaney & Carpenter, LLP, attorneys; John
       J. O'Reilly and Andrew Gimigliano, on the
       brief).

       JUSTICE ALBIN delivered the opinion of the Court.

In this interlocutory appeal, we must determine two issues: what is the appropriate standard of appellate review of a trial court's factual findings based solely on the court's viewing of a video-recorded police interrogation, and did defendant invoke his right to remain silent during the interrogation.

Relying solely on a review of the video-recorded interrogation, the trial court found that defendant asserted his right to silence when he said, "that's all I got to say. That's it." The trial court suppressed all statements made after that utterance because the investigators failed to honor defendant's invocation of his right to remain silent in violation of Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

A panel of the Appellate Division engaged in a de novo review of the video-recorded interrogation and reversed. The panel made its own factual findings based on defendant's tone of voice and the flow of the interview, concluding that defendant did not assert his right to remain silent. In applying the de novo standard of review, the panel relied on language in State v. Diaz-Bridges, 208 N.J. 544, 566 (2011), which stated that when "the trial court's factual findings are based only on its viewing of a recorded interrogation that is equally available to the appellate court . . . deference to the trial court's interpretation is not required."

2

After a careful reappraisal of <u>Diaz-Bridges</u>, we now hold that the non-deferential standard articulated in that case is at odds with traditional principles limiting appellate review. We have reached this conclusion for several reasons.

First, our system of justice assigns to our trial courts the primary role of factfinder. That role is especially suited to our trial judges, who have ongoing experience and expertise in making factual rulings. Trial judges routinely make factual determinations not only in assessing the credibility of witnesses but also in assessing documentary evidence, which oftentimes is susceptible to alternative inferences.

Second, the customary role of an appellate court is not to make factual findings but rather to decide whether those made by the trial court are supported by sufficient credible evidence in the record. That limited standard of review is consistent with the belief that appellate courts should not replicate the work of our trial courts or reverse their factfindings based on a mere difference of opinion.

Third, notions of judicial economy and finality call for a standard of review where appellate courts defer to a trial court's factual findings in the absence of clear error.

Applying these principles, we find that the trial court's factual determination, based solely on its review of the video-recorded interrogation, is supported by sufficient credible

3

evidence in the record.  Although the Appellate Division and trial court drew different inferences from the record, we conclude that the inferences drawn by the trial court were reasonable and that the trial court's ultimate determination was not clearly mistaken.

We therefore reverse the judgment of the Appellate Division and remand to the trial court for proceedings consistent with this opinion.

I.

A.

In 2011, defendant S.S. was tried before a jury and convicted of first-degree aggravated sexual assault of his six-year-old daughter, N.J.S.A. 2C:14-2(a)(1), and second-degree endangering the welfare of his child, N.J.S.A. 2C:24-4(a).  The trial court sentenced defendant to a fifteen-year prison term on the sexual-assault charge, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and to a concurrent five-year term on the endangering charge.  The Appellate Division reversed those convictions for reasons unrelated to this appeal and ordered a new trial.  This Court denied the State's petition for certification, State v. S.S., 220 N.J. 573 (2015), and defendant's cross-petition, State v. S.S., 220 N.J. 574 (2015).

Before the start of the second trial, defendant moved for the first time to suppress incriminating statements he made to

4

investigators in the Hudson County Prosecutor's Office, claiming that investigators failed to honor his invocation of his right to silence in violation of Miranda.[1]

The Honorable Sheila A. Venable, P.J.Cr., conducted a Miranda hearing pursuant to N.J.R.E. 104(c)[2] at which the State introduced one piece of evidence -- the video-recorded interrogation. Neither the State nor the defense called any witnesses. From her review of that video, Judge Venable made her ultimate findings of fact.

To give context to defendant's interrogation and the factual conclusions reached by the trial court, we begin with the events that led to the interrogation.[3]

### B.

In August 2009, defendant and "Jane" had been married for five years and were the parents of two daughters, "Marilyn," age six, and "Lois," age four.[4] While defendant and Jane worked

---

[1] The trial court denied defendant's motion to redact certain portions of his statement before his first trial. That statement was admitted into evidence at that trial.

[2] N.J.R.E. 104(c) provides that "the judge shall hear and determine the question of [a defendant's statement's] admissibility" in a preliminary hearing.

[3] The background information presented here is gleaned from portions of defendant's interrogation and evidence adduced at the first trial.

[4] We use pseudonyms to protect the privacy of the children and the mother.

during the week, Lois was in daycare, and a babysitter looked after Marilyn.  On August 21, 2009, Marilyn was at the babysitter's house.  While the babysitter was changing her infant son's diaper, Marilyn began asking questions about the infant's penis.  During the conversation, Marilyn told the babysitter that defendant put his penis in her mouth.

Later, the babysitter told Jane about her daughter's claim.  In response to an anonymous call alleging that defendant had abused Marilyn, a representative of the Division of Youth and Family Services[5] (DYFS) visited defendant's home and interviewed each family member.  On August 25, 2009, defendant, Marilyn, the babysitter, and Jane each gave video-recorded statements to Sergeant Kenneth Kolich and Detective Polly Hans of the Hudson County Prosecutor's Special Victims Unit.

During her interview, Marilyn denied that her father abused her or put his penis in her mouth.  She also denied making the comment that the babysitter attributed to her.  In speaking with the investigators, the babysitter stood by her recollection of Marilyn uttering that one remark.  The babysitter noted, however, that Marilyn never repeated the statement.  Jane told the investigators that she did not believe that an act of abuse

_____

[5] Since the events in this case, the Division of Youth and Family Services was renamed the Department of Child Protection and Permanency (DCPP).

had occurred.

C.

After those interviews, Sergeant Kolich and Detective Hans interrogated defendant in the Hudson County Prosecutor's Office.[6] Defendant waited for several hours in a room in the Prosecutor's Office before the interrogation started at about 6:17 p.m. For approximately forty-seven minutes, Detective Hans conducted the interrogation alone. She began by reading defendant his Miranda rights, which included advising him that he had "the right to remain silent" and that anything he said would "be used against [him] in court." In response to Detective Hans's questions, defendant repeatedly denied that he had abused his daughter.

After Sergeant Kolich entered the interview room, the questioning became increasingly accusatory. Sergeant Kolich repeatedly made the misrepresentation that Marilyn told the investigators that defendant put his penis in her mouth. At various times, Sergeant Kolich made such statements as, "your daughter finally told us the truth," "[s]he was brave enough to tell us that her daddy did something to her," "she kept coming up to the truth," and "this is a big coverup between you and your wife." Sergeant Kolich, again and again, accused defendant of lying and warned that a judge was unlikely to believe his

_____

[6] No one disputes that defendant was in custody for Miranda purposes during the interrogation.

7

account over his daughter's.

A little more than one hour into the interrogation, the following exchange occurred:

> SERGEANT KOLICH: [T]here's something inside you you want to say, and you're fighting it. You're fighting it.
>
> [DEFENDANT]: <u>No, that's all I got to say. That's it.</u>
>
> [SERGEANT KOLICH]: You're fighting it, man. I told you in the beginning our job is to help put families back together . . . .
>
> [(emphasis added).]

At this point, defendant had denied the accusations more than a dozen times. The interrogation proceeded, and defendant continued to suggest that he did not want to speak:

> SERGEANT KOLICH: Why, with all the people in the world, would your daughter pick on you and say you did this if it wasn't true?
>
> [DEFENDANT]: I don't know. That's all I can say.

Approximately one hour and thirteen minutes into the interrogation, a forty-nine-minute break was taken. When the investigators returned, the following colloquy occurred:

> DETECTIVE HANS: Is there anything that you thought about? Anything that you want to tell us?
>
> [DEFENDANT]: No.

Almost immediately after this exchange, at defendant's request, Detective Hans left the room. The interrogation

8

continued, with Sergeant Kolich urging defendant to confess. Sergeant Kolich pressed when defendant indicated that something occurred "a long time ago" when he was drunk.

> SERGEANT KOLICH:  Start from the beginning and tell me what happened.
>
> [DEFENDANT]:  <u>I really got to talk about it?</u>
>
> SERGEANT KOLICH:  It's going to help.
>
> [(emphasis added).]

Defendant then indicated that "it happened" when, after a shower, he was drying himself and Marilyn entered the bathroom. Sergeant Kolich persisted in his questioning:

> SERGEANT KOLICH:  So, you're drying yourself in the bathroom and [Marilyn] walks out of her bedroom into the bathroom, right?  And then what happens?
>
> [DEFENDANT]:  <u>I don't want to talk about it.</u>
>
> SERGEANT KOLICH:  Listen to me.  How do I know you're telling the truth unless you tell me what happened?
>
> [(emphasis added).]

In response to repeated questions, defendant indicated, "It happened."  Then, Sergeant Kolich asked, "I don't want to put words in your mouth, but she put her mouth on your penis," to which defendant replied, "Yes."  Defendant stated that he was drunk at the time and Marilyn was about four years old.

### D.

In ruling on the motion to suppress, the trial court relied

9

solely on its review of the video-recorded interrogation.  It
concluded that the investigators failed to scrupulously honor
defendant's right to cut off questioning, as required by
Michigan v. Mosley, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313
(1975).  The court held that "defendant clearly indicated his
intention to end the interrogation when he stated, no, that's
all I got to say.  That's it."  According to the court,
defendant's desire to remain silent was "made more obvious"
during further questioning by Sergeant Kolich.  The court
maintained that "[e]ven if it were merely ambiguous to the
interrogators what the defendant's intentions were, the onus was
on [them] to clarify those intentions."[7]  Because it found that
defendant invoked his right to remain silent under Miranda when
he said, "No, that's all I got to say.  That's it," the court
entered an order suppressing all statements made after that
point in the interrogation.

### E.

The Appellate Division granted the State's motion for leave
to appeal, and in an unpublished, per curiam opinion, a two-
member panel reversed the trial court's order suppressing
defendant's admissions made during the interrogation.  The panel

---

[7] The trial judge did not find that defendant's headshaking or
non-verbal responses were attempts to invoke his right to remain
silent.

noted that it defers to a "trial court's findings of fact that are supported by sufficient credible evidence in the record" when the suppression hearing involves the taking of witness testimony. The panel stated, however, that such deference is not required when "the trial court's factual findings are based only on its viewing of a recorded interrogation that is equally available to the appellate court," quoting Diaz-Bridges, supra, 208 N.J. at 566. Relying on Diaz-Bridges, the panel engaged in a de novo review of the video-recorded interrogation and made its own factual findings.

The panel "disagree[d] with the trial judge's interpretation of defendant's responses," finding that "defendant's words and silences" did not suggest that he wanted to stop the questioning or that the investigators had a duty to inquire whether defendant wanted to invoke his right to remain silent. For example, the panel explained that when defendant stated, "No, that's all I got to say. That's it," defendant's response "meant he had no explanation for his daughter's conduct" and that "[h]e had said what he was going to say about the subject." That understanding of defendant's intention was "clear" to the panel from "defendant's level unchanged tone."

Other alleged invocations of the right to remain silent, in the panel's view, were expressions that defendant was "at a loss for words to explain the reason his daughter would have accused

11

him" or that defendant was simply "denying culpability." The panel reached those conclusions because of "defendant's even tone of voice" or "defendant's tone . . . in the context of the flow of the conversation." The panel determined that, based on its "independent review of the video," the State had proven beyond a reasonable doubt that defendant never revoked his initial waiver of his right to remain silent.

We granted defendant's motion for leave to appeal. State v. S.S., 226 N.J. 207 (2016). We also granted the motions of the American Civil Liberties Union (ACLU-NJ) and the Association of Criminal Defense Lawyers of New Jersey (ACDL-NJ) to participate as amici curiae.

II.

A.

1.

Defendant contends that the Appellate Division's decision upending the trial court's suppression order should be reversed. First, defendant argues that, by any objective standard, he unambiguously invoked his right to remain silent during the interrogation by stating, "No, that's all I got to say. That's it." In defendant's view, those words are not susceptible to another reasonable interpretation, and any purported ambiguity concerning whether he wished to cut off questioning should have prompted the interrogators to seek clarification from him.

12

Second, defendant argues that when the plain words spoken by a defendant clearly indicate the invocation of a Miranda right during an interrogation, a deferential standard of review is not appropriate. He states, however, that if "a subjective factor such as 'tone' can be considered in determining the effectiveness of the invocation," then deference to the trial court's assessment is in order.

Defendant is critical of the Appellate Division's focus on defendant's "tone" because "tone" may be conditioned by one's culture, race, mental health, gender, or be explained by the hostile setting of a police interrogation. Thus, defendant concludes that if his statements must be viewed through the prism of "a subjective interpretation process," then the Appellate Division panel should have deferred to the trial court. Defendant asks this Court to revisit the Diaz-Bridges de novo standard of review for video-recorded statements, which he claims has caused confusion.

2.

Amicus ACDL-NJ contends that this Court should hew to the traditional standard of appellate review, which requires deference to the factual findings of a trial court even when those findings are based solely on video or documentary evidence. The ACDL-NJ urges this Court to reject the de novo standard adopted by Diaz-Bridges and to reaffirm that a trial

13

court's factual findings will not be disturbed unless clearly mistaken. That approach, it posits, will advance judicial goals of "stability, consistency, and finality." Here, the ACDL-NJ submits that the appellate panel merely substituted its own factual findings for those of the trial court. The ACDL-NJ also disapproves of the panel's use of defendant's "tone" to suggest that defendant's clearly spoken words did not reveal his intent to invoke his right to silence.

### 3.

Amicus ACLU-NJ condemns the Appellate Division's references to defendant's composure and "even" and "quiet" tone of voice as a basis for its rejection of defendant's unambiguous invocation of the right to silence. The ACLU-NJ states that when a court disregards an explicit invocation of a right based on tone of voice, equal-protection concerns are implicated because "tone," in part, is a factor of race and culture. By way of example, the ACLU-NJ contends that young black men are often counseled to take a conciliatory approach when interacting with the police. For that reason, the ACLU-NJ submits, a suspect's words should matter, not his tone of voice, in determining whether he invoked his rights.

### B.

The State submits that "Diaz-Bridges governs the standard of review" in this case. It urges that we adhere to the policy

14

of allowing an appellate court to "conduct a de novo review . . . when the trial court's factual findings are based solely on the video recording," citing Diaz-Bridges, supra, 208 N.J. at 565-66. The rationale for this approach, the State maintains, is that "the trial court has no advantage over a reviewing court in evaluating a video recording." The State insists that although deference is appropriate when the trial court makes factual findings based on live witness testimony, deference is not warranted when "the only evidence is a video recording that is equally available and reviewable by all courts." Accordingly, the State asks that we reaffirm the Diaz-Bridges standard of review.

The State also argues that independent factfinding by the appellate court was appropriate because "the trial court simply reviewed defendant's alleged invocations alone and not in context with the actual questions asked or . . . defendant's conduct and demeanor during the entire conversation." In this regard, the State contends that the appellate panel properly "considered the flow of the conversation" and defendant's tone of voice, which remained "'level' and 'unchanged'" throughout the interrogation, thus indicating that defendant was not truly invoking his right to remain silent. In light of the entire interview, according to the State, it is clear that defendant did not unequivocally or ambiguously invoke his right to remain

15

silent.

### III.

### A.

We first address the standard of appellate review that should govern when a trial court's factual findings are based solely on the review of a video recording or documentary evidence.

The traditional deference given to factual findings of the trial court has deep roots in our jurisprudence. Generally, on appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when "those findings are supported by sufficient credible evidence in the record." State v. Gamble, 218 N.J. 412, 424 (2014). In the typical scenario of a hearing with live testimony, appellate courts defer to the trial court's factual findings because the trial court has the "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).

We have cautioned that a trial court's factual findings should not be overturned merely because an appellate court disagrees with the inferences drawn and the evidence accepted by the trial court or because it would have reached a different conclusion. Ibid. An appellate court should not disturb a

16

trial court's factual findings unless those findings are "so clearly mistaken that the interests of justice demand intervention and correction." Gamble, supra, 218 N.J. at 425 (quoting Elders, supra, 192 N.J. at 244).

In Elders, based on both a video recording and eyewitness testimony, the trial court made factual findings that troopers engaged in an unconstitutional investigative detention. Id. at 235, 248. We determined that the trial court's reliance, in part, on the video did not extinguish the deference the Appellate Division owed to the trial court's factual findings. Id. at 244-45. In that case, although the trial court's decision was a close call, it was not clearly mistaken and therefore entitled to deference. Id. at 250-51.

The issue here, however, concerns the level of deference owed to a trial court's factual findings based solely on its review of a video recording or documentary evidence.

That issue arose in Diaz-Bridges, supra, 208 N.J. 544, although in a slightly different context than the one before us. There, the defendant asserted that he had invoked his right to silence during a custodial interrogation by requesting permission to speak with his mother and sought to suppress all statements following his purported invocation. Id. at 556, 560. At the suppression hearing, the trial court considered the video-recorded interrogation and the testimony of three

17

detectives. Id. at 556. The trial court made factual findings that the defendant invoked his right to silence at a defined point in the interrogation, based in large part on its review of the video. Id. at 556-58. The Appellate Division reversed the trial court after independently reviewing the video-recorded interrogation, finding that the defendant invoked his right to silence much later in the interrogation. Id. at 558, 560. The Appellate Division suppressed all statements from that later fixed point. Id. at 559-60. This Court then reversed both courts, concluding that the defendant never invoked his right to silence in a constitutionally acceptable manner. Id. at 572.

In doing so, this Court expressed its view that a reviewing court need not give deference to another court's factual findings based solely on a video-recorded interrogation. Id. at 565-66. The Court stated: "When the trial court's factual findings are based only on its viewing of a recorded interrogation that is equally available to the appellate court and are not dependent on any testimony uniquely available to the trial court, deference to the trial court's interpretation is not required." Id. at 566. The Court reached that conclusion because of its belief that "there is little, if anything, to be gained from deference" in such a scenario, and therefore appellate courts should be free to make their own factual findings from a video-recorded interrogation. Id. at 565-66.

18

In Diaz-Bridges, the trial court, Appellate Division, and this Court each made different factual findings from the video-recorded interrogation.  Of course, in that paradigm, the factual findings of the highest reviewing court always prevail.

Diaz-Bridges did not reference or acknowledge out-of-state authorities that rejected or supported its basic assumption -- that "there is little, if anything, to be gained from deference" when the sole evidence relied on by the factfinder is a video-recorded interrogation.  See id. at 565.

In State v. Hubbard, 222 N.J. 249 (2015), we elided squarely confronting the issue we face today because, in that case, we were not dealing with factual findings resting solely on the review of a video-recorded interrogation.  But both the opinion of the Court and the concurring opinion in Hubbard referenced authority from other jurisdictions, indicating that there is much to be gained from a policy of deference to a trial court's factfindings, even when based solely on documentary or video evidence.  Id. at 264; see also id. at 273-76 (Albin J., concurring).

We now turn to those jurisdictions that have come to a different conclusion than that of the Diaz-Bridges Court on the standard of appellate review in cases like the one before us.

B.

Federal courts, and a number of state courts, have adopted

19

a standard of appellate review that requires deference to a trial court's factual findings when those findings are based on viewing a video-recorded interrogation or search. The policy reasons for a deferential approach are set forth in Anderson v. City of Bessemer City, 470 U.S. 564, 574-75, 105 S. Ct. 1504, 1511-12, 84 L. Ed. 2d 518, 528-30 (1985). There, the United States Supreme Court stated:

> The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources.
>
> [Id. at 574-75, 105 S. Ct. at 1512, 84 L. Ed. 2d at 529.]

The Anderson Court adopted a clearly erroneous standard of review, which prohibits appellate courts from substituting their judgments for those of the trial court. Id. at 573-74, 105 S. Ct. at 1511, 84 L. Ed. 2d at 528. In this regard, the Supreme Court stated: "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other

20

facts." Ibid. (citations omitted).

Federal Rule of Civil Procedure 52(a)(6) was amended the same year that the United States Supreme Court released its decision in Anderson. Fed. R. Civ. P. 52(a)(6) (indicating that rule was amended in 1985). That Rule provides: "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Ibid. (emphasis added). The Advisory Committee's comments on the 1985 amendments to the Rule provide the following explanation for adopting the "clearly erroneous" standard of review, even for non-testimonial evidence:

> The principal argument advanced in favor of a more searching appellate review of findings by the district court based solely on documentary evidence is that the rationale of Rule 52(a) does not apply when the findings do not rest on the trial court's assessment of credibility of the witnesses but on an evaluation of documentary proof and the drawing of inferences from it, thus eliminating the need for any special deference to the trial court's findings. These considerations are outweighed by the public interest in the stability and judicial economy that would be promoted by recognizing that the trial court, not the appellate tribunal, should be the finder of the facts. To permit courts of appeals to share more actively in the fact-finding function would tend to undermine the legitimacy of the district courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority.

[Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment.]

Thus, the Advisory Committee rejected "a more searching appellate review" in favor of a "clearly erroneous" standard for "documentary evidence," including video evidence. See ibid. The Federal Rules of Criminal Procedure do not contain an analogous rule. However, the United States Supreme Court has indicated that "the considerations underlying [Federal Rule of Civil Procedure] 52(a) . . . apply with full force in the criminal context, at least with respect to factual questions having nothing to do with guilt." Maine v. Taylor, 477 U.S. 131, 145, 106 S. Ct. 2440, 2451, 91 L. Ed. 2d 110, 125 (1986) (citation omitted).

Indeed, several United States Circuit Courts of Appeals have applied a deferential standard in reviewing a trial court's factual findings based on video evidence.[8] See, e.g., United States v. Anderson, 755 F.3d 782, 790 (5th Cir. 2014) (applying clear error standard in reviewing "district court's denial of [defendant's] motion to suppress his interrogation video"); United States v. Murphy, 703 F.3d 182, 188-90 (2d Cir. 2012) (applying clear error standard in reviewing video evidence in suppression hearing); United States v. Pierce, 622 F.3d 209, 210

---

[8] The fact that these federal courts considered other evidence in addition to video evidence had no impact on the applicable deferential standard of review.

22

(3d Cir. 2010) (applying clear error standard to district court's factual findings based on review of evidence that included forty-two minute video recording of traffic stop); United States v. Simpson, 609 F.3d 1140, 1146 (10th Cir. 2010) (applying clear error standard in reviewing district court's factfinding "even when, as here, there is video tape of the stop and detention"); United States v. Guerrero, 374 F.3d 584, 586-87, 590-91 (8th Cir. 2004) (applying clear error standard to factfindings based on review of video recording of incident); United States v. Navarro-Camacho, 186 F.3d 701, 707-08 (6th Cir. 1999) (applying clear error standard in reviewing video evidence in suppression hearing).

Several state jurisdictions also utilize a deferential standard in reviewing a trial court's factual findings based on video evidence. See, e.g., Robinson v. State, 5 N.E.3d 362, 365 (Ind. 2014) (noting that deferential "appellate standard of review remains constant," even "when faced with video evidence"); State v. Williams, 334 S.W.3d 177, 181 (Mo. Ct. App. 2011) (applying clearly erroneous standard of review to video evidence in suppression hearing because "trial court's findings of fact are entitled to deference even where they are based on physical or documentary evidence"); Montanez v. State, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006) (holding that "deferential standard of review . . . applies to a trial court's

23

determination of historical facts when that determination is based on a videotape recording admitted into evidence at a suppression hearing"); State v. Walli, 799 N.W.2d 898, 904 (Wis. Ct. App.) ("[W]hen evidence in the record consists of disputed testimony and a video recording, we will apply the clearly erroneous standard of review when we are reviewing the trial court's findings of fact based on that recording."), petition for review denied, 806 N.W.2d 639 (Wis. 2011).

In contrast, a number of jurisdictions favor a de novo approach. See, e.g., People v. Madrid, 179 P.3d 1010, 1014 (Colo. 2008) ("[W]here the statements sought to be suppressed are audio- and video-recorded, . . . we are in a similar position as the trial court to determine whether the statements should be suppressed."); State v. Akuba, 686 N.W.2d 406, 418 (S.D. 2004) ("'[B]ecause we had the same opportunity to review the videotape . . . as the trial court,' we review [it] de novo." (second alteration in original) (quoting State v. Tuttle, 650 N.W.2d 20, 34 n.11 (S.D. 2002))); State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000) (stating that "rationale underlying a more deferential standard of review is not implicated" when court's factfindings in suppression hearing based solely on video evidence).

### C.

We now conclude -- after weighing all sides of the issue --

24

that a standard of deference to a trial court's factfindings, even factfindings based solely on video or documentary evidence, best advances the interests of justice in a judicial system that assigns different roles to trial courts and appellate courts. We reject the de novo standard introduced in Diaz-Bridges for the following reasons.

Our system of justice assigns to the trial court the role of factfinder in matters not relegated to the jury. Trial judges in our Criminal Part routinely hear and decide suppression motions in which defendants seek to exclude evidence based on alleged violations of the Fourth and Fifth Amendments of the United States Constitution and corollary provisions of our State Constitution and common law. Our trial judges have ongoing experience and expertise in fulfilling the role of factfinder. See Anderson, supra, 470 U.S. at 574-75, 105 S. Ct. at 1512, 84 L. Ed. 2d at 529-30.

By contrast, the task of appellate courts generally is limited to reviewing issues of law. Because legal issues do not implicate the fact-finding expertise of the trial courts, appellate courts construe the Constitution, statutes, and common law "de novo -- 'with fresh eyes' -- owing no deference to the interpretive conclusions" of trial courts, "unless persuaded by their reasoning." See State v. Morrison, 227 N.J. 295, 308 (2016) (quoting State v. Goodwin, 224 N.J. 102, 110 (2016)).

25

A policy of deferring to findings of fact of a trial court based on its review of video and documentary evidence has certain tangible benefits.  When more than one reasonable inference can be drawn from the review of a video recording, say of an interrogation, then the one accepted by a trial court cannot be unreasonable and the alternative inference accepted by an appellate court cannot be superior.  In such a scenario, a trial court's factual conclusions reached by drawing permissible inferences cannot be clearly mistaken, and the mere substitution of an appellate court's judgment for that of the trial court's advances no greater good.  A de novo standard of review permits the trial court, Appellate Division, and this Court to draw reasonable inferences from a review of a video recording and yet reach different findings of fact.  In this hierarchy, the highest appellate court's factual findings prevail, not because they are necessarily superior but because they are last.

Permitting appellate courts to substitute their factual findings for equally plausible trial court findings is likely to "undermine the legitimacy of the [trial] courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority."  See Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment.  In our view, the public's interest in "stability and judicial economy" is promoted by designating our

26

trial courts, rather than appellate courts, as "the finder of the facts," in the absence of clear error.  See ibid.

Acknowledging that a trial court's factual findings are entitled to deference does not mean that appellate courts must give blind deference to those findings.  Appellate courts have an important role to play in taking corrective action when factual findings are so clearly mistaken -- so wide of the mark -- that the interests of justice demand intervention.  See Elders, supra, 192 N.J. at 245.  Deference ends when a trial court's factual findings are not supported by sufficient credible evidence in the record.  Gamble, supra, 218 N.J. at 424.

Special justification is present for parting ways with the standard articulated in Diaz-Bridges.  Although "stare decisis serves a number of salutary purposes, which includes promoting certainty and stability in our law," it "is not a command to continue on a misguided course."  State v. Witt, 223 N.J. 409, 415 (2015).  In adopting the clearly mistaken/clearly erroneous standard of appellate review for factual findings based on a video recording or documentary evidence, we promote principles of fairness, efficiency, and judicial economy in our system of justice.

Having determined the applicable standard of review, we next turn to the governing principles of law in this case.

27

IV.

A.

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. Nyhammer, 197 N.J. 383, 399, cert. denied, 558 U.S. 831, 130 S. Ct. 65, 175 L. Ed. 2d 48 (2009). In Miranda, supra, the United States Supreme Court put in place constitutional safeguards to give an individual a meaningful opportunity to exercise his right against self-incrimination when subject to police interrogation while in custody. 384 U.S. at 477, 86 S. Ct. at 1629, 16 L. Ed. 2d at 725. The Supreme Court decreed that the police must adequately and effectively advise an individual of his right to remain silent, and other rights, before questioning. Id. at 467, 86 S. Ct. at 1624, 16 L. Ed. 2d at 719. The purpose of Miranda warnings is "[t]o counteract the inherent psychological pressures in a police-dominated atmosphere that might compel a person 'to speak where he would not otherwise do so freely.'" Nyhammer, supra, 197 N.J. at 400 (quoting Miranda, supra, 384 U.S. at 467, 86 S. Ct. at 1624, 16 L. Ed. 2d at 719).

Under the United States Supreme Court's interpretation of the Fifth Amendment, the police are required to stop a custodial interrogation when a suspect unambiguously asserts his right to

28

remain silent.  Berghuis v. Thompkins, 560 U.S. 370, 381-82, 130 S. Ct. 2250, 2260, 176 L. Ed. 2d 1098, 1110-11 (2010).  In contrast, under our state law privilege against self-incrimination, "a request, 'however ambiguous,' to terminate questioning . . . must be diligently honored."  State v. Bey (Bey II), 112 N.J. 123, 142 (1988) (quoting State v. Hartley, 103 N.J. 252, 263 (1986)).  Words used by a suspect are not to be viewed in a vacuum, but rather in "the full context in which they were spoken."  State v. Roman, 382 N.J. Super. 44, 64 (App. Div. 2005), certif. granted, 188 N.J. 219 (2006), certif. dismissed as improvidently granted, 189 N.J. 420 (2007).

In that light, "[a]ny words or conduct that reasonably appear to be inconsistent with defendant's willingness to discuss his case with the police are tantamount to an invocation of the privilege against self-incrimination."  Bey II, supra, 112 N.J. at 136.  In those circumstances in which the suspect's statement is susceptible to two different meanings, the interrogating officer must cease questioning and "inquire of the suspect as to the correct interpretation."  State v. Johnson, 120 N.J. 263, 283 (1990) (quoting State v. Wright, 97 N.J. 113, 120 n.4 (1984)).  Unless the suspect makes clear that he is not invoking his right to remain silent, questioning may not resume.  Ibid.  In other words, if the police are uncertain whether a suspect has invoked his right to remain silent, two alternatives

29

are presented: (1) terminate the interrogation or (2) ask only those questions necessary to clarify whether the defendant intended to invoke his right to silence. Id. at 283-84.

B.

To invoke the right to remain silent, a suspect does not have to follow a prescribed script or utter talismanic words. Id. at 281. Suspects are mostly lay people unschooled in the law. They will often speak in plain language using simple words, not in the parlance of a constitutional scholar. So long as an interrogating officer can reasonably understand the meaning of a suspect's words, the suspect's request must be honored. See ibid.

Words similar to those used by defendant here have been considered sufficient to invoke the right to silence. See, e.g., ibid. ("[A] suspect who has 'nothing else to say,' . . . has asserted the right to remain silent." (citations omitted)); State v. Bey (Bey I), 112 N.J. 45, 64 (1988) (finding invocation of right to silence when defendant indicated "he would have nothing to say"); accord Christopher v. Florida, 824 F.2d 836, 842 (11th Cir. 1987) (holding that defendant unequivocally invoked right to silence by saying "[o]kay then. I got nothing else to say"), cert. denied, 484 U.S. 1077, 108 S. Ct. 1057, 98 L. Ed. 2d 1019 (1988); United States v. Reid, 211 F. Supp. 2d 366, 373-74 (D. Mass. 2002) (determining that "I have nothing

else to say" constituted assertion of right to silence); Commonwealth v. Hearns, 10 N.E.3d 108, 116 (Mass. 2014) (finding that defendant clearly invoked right to remain silent when he said, "Well then, I don't want to talk.  I haven't got nothing to say").

In Johnson, supra, the defendant, a murder suspect, while questioned by police, repeatedly responded, "I can't talk about it."  120 N.J. at 267, 284.  We recognized that the defendant's response "could be construed as an expression of either emotional reluctance to admit guilt or the desire to cut off questioning."  Id. at 284.  Given that "ambiguity," "the officers were required to stop the interrogation completely, or to ask only questions narrowly directed to determining whether defendant was willing to continue."  Ibid.

We have made clear that "[w]here the invocation of the right to remain silent is followed by no interruption in questioning, and where the interrogation continues as if nothing had happened, the right is not scrupulously honored."  Id. at 282.  Importantly, "the State bears the burden of proving beyond a reasonable doubt that a [suspect's] confession [was] voluntary" and not the result of law enforcement conduct that overbore his will.  Hubbard, supra, 222 N.J. at 267.

We now apply the applicable standard of review and principles of law to the facts of the case before us.

31

V.

The trial court decided the motion to suppress based on the one piece of evidence before it -- the video-recorded confession. In rendering its decision, the court noted, "defendant repeatedly denied the allegations, shook his head and made statements to the effect of denying the allegations" for approximately one hour until the following exchange. Sergeant Kolich stated, "[T]here's something inside you you want to say, and you're fighting it. You're fighting it," to which defendant replied, "No, that's all I got to say. That's it." At this point, according to the trial court, "defendant clearly indicated his intention to end the interrogation." The court also held that "defendant's intention [to remain silent] w[as] made more obvious" in his responses to the sergeant's later questioning. As noted earlier, immediately after the forty-nine minute break, Detective Hans asked defendant, "Anything that you want to tell us?" Defendant replied "No." In response to other questions, defendant suggested he did not want to speak, stating "I really got to talk about it?" and "I don't want to talk about it."

The trial court concluded that, based on its review of the entire video-recorded interrogation, "defendant unambiguously invoked his right to silence" from the point he stated, "that's all I got to say." The court noted that even if defendant's

32

intentions "were merely ambiguous" in the minds of the investigators, "the onus was [on them] to clarify those intentions."  Because "defendant's right to cut off questioning was not respected here," the court suppressed all statements after defendant first asserted his right to silence.

Whatever the tone of a suspect's voice, whether it is loud or soft or unchanged or shifting, or whether the suspect is calm or jittery or submissive or antagonistic, words will make a difference and oftentimes have an objective meaning to reasonable law enforcement officers.  If a suspect says, "I invoke my right to silence under the Fifth Amendment," it makes no difference whether he does so in a whisper or shouting to the rafters.  Elevating the importance of tone over the import of words, as the Appellate Division did here, can lead to injecting a high degree of subjectivity into the analysis.  At the same time, we acknowledge that there are considerations that might give import to the meaning of words, such as the inflection in one's voice or bodily movements.  For that reason, reading a cold transcript is no substitute for viewing the video in evaluating the circumstances of an interrogation.

The Appellate Division cannot be faulted for applying a de novo standard of review; it followed the guidance given in Diaz-Bridges.  The flaw in the de novo standard was demonstrated here.  The Appellate Division substituted its interpretation of

33

the video in place of the trial court's reasoned analysis.

Having reviewed the video-recorded interrogation in light of the nature and history of the case, we find that the trial court's factual conclusions are supported by sufficient credible evidence in the record and therefore are not clearly mistaken. Because the interrogating investigators failed to honor defendant's invocation of his right to silence or, at the very least, to seek clarification if they thought that defendant's statements were ambiguous, we affirm the trial court's suppression order. Accordingly, defendant's statements, after he said, "No, that's all I got to say. That's it," are inadmissible.

## VI.

For the reasons expressed, we reverse the judgment of the Appellate Division. An appellate court ordinarily should defer to a trial court's factual findings, even when those findings are based solely on its review of a video recording. Deference, however, is not required when the trial court's factual findings are clearly mistaken.

We find that sufficient credible evidence in the record supports the trial court's factual finding that defendant invoked his right to silence during the interrogation. We therefore uphold the trial court's order suppressing statements

34

made by defendant to Detective Hans and Sergeant Kolich.  We remand for proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE ALBIN's opinion.