**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4026-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

COREY S. MARTIN,

    Defendant-Appellant.

_____

Submitted September 16, 2021 – Decided October 6, 2021

Before Judges Fuentes and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No 18-03-0165.

Joseph E. Krakora, Public Defender, attorney for appellant (James K. Smith, Jr., Assistant Deputy Public Defender, of counsel and on the brief).

Angelo J. Onofri, Mercer County Prosecutor, attorney for respondent (Alicia Gres, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After the trial court denied his suppression motion, defendant Corey S. Martin pleaded guilty to one count of second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1), and was sentenced to a three-year term of probation. Because the trial court did not err in denying the suppression motion, we affirm.

Defendant was indicted by a grand jury for second-degree unlawful possession of a handgun, id., third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(1), and third-degree receiving stolen property, N.J.S.A. 2C:20-7(a). Defendant moved to suppress physical evidence obtained after an allegedly improper motor-vehicle stop.

During the suppression hearing, the following facts were elicited. On December 17, 2017, at approximately 5:00 p.m., Trenton Police Detectives Nicholas Mahan and Brieer Doggett responded to a ShotSpotter[1] report and a radio call about gunfire near the area of 160 Oakland Street. As the detectives were en route to Oakland Street, a second ShotSpotter report identified gunfire near 400 Rutherford Avenue. While in transit to Rutherford Avenue, the

---

[1] According to ShotSpotter's website, ShotSpotter is a gunfire detection, location, and reporting system. See Precision Policing Platform: Platform Overview, ShotSpotter, https://www.shotspotter.com/platform (last visited Sept. 27, 2021).

detectives received a radio call that the suspect was in "a dark colored car with tinted windows."

As the detectives approached a stop sign at the intersection of Oakland and Prospect Street, Mahan saw a dark-colored vehicle with tinted windows coming up Prospect from the direction of Rutherford. As the vehicle made a "hurried" left turn onto Oakland, Mahan shined his flashlight into the driver's-side window of the vehicle and confirmed the vehicle was dark-colored with tinted windows. Mahan observed defendant, who was driving, "lean back, lean over to the right like [he was] try[ing] to avoid any . . . eye contact." After a brief conversation with Doggett, Mahan made a U-turn and proceeded onto Oakland with the intent to conduct a vehicle stop. As Mahan completed the U-turn, defendant's vehicle turned right onto Alden Avenue. When the detectives reached the intersection of Oakland and Alden, defendant's vehicle was stopped, and Mahan saw "a black object go out the driver's side window" and land in the street away from the car. Defendant's vehicle then accelerated towards Pennington Avenue.

The detectives approached the area where defendant's vehicle had been stopped. As Doggett continued to observe defendant's vehicle driving down Alden, Mahan shined his flashlight on the discarded object and saw it was a

handgun. Doggett radioed other police units the direction defendant's vehicle was travelling, and Mahan drove after defendant's vehicle. Observing the vehicle stopped in traffic, Mahan activated his car's police lights and sirens with the intent to conduct "a felony stop" and arrest defendant in connection with the discarded handgun. Defendant pulled his vehicle over to the side of the road. Over a loudspeaker, the detectives ordered defendant to shut the car off. Defendant complied, rolled down a window, stuck his head out, and said, "whatever it is you think I did, I didn't do." The detectives ordered defendant to throw his keys out of the window; he complied.

With assisting officers present with their weapons drawn, Mahan approached defendant's vehicle, grabbed defendant's hands, and removed him from the vehicle. As Mahan removed defendant, he smelled gunpowder emanating from defendant. Another officer placed defendant in handcuffs, searched him, found in his pocket live rounds of ammunition, and arrested him accordingly.

The detectives retrieved the discarded handgun in the same area where they had seen it land. According to Mahan, the gun smelled like it had just been fired. Mahan found in the magazine of the gun a live round matching the ammunition found in defendant's pocket.

4

Defendant subsequently moved to suppress physical evidence. Mahan and defendant testified at the suppression hearing. Defendant denied discarding anything from his vehicle and stated the ammunition found in his pocket belonged to a friend. He asserted he was not handcuffed until after the bullets were found in his pocket.

In a comprehensive opinion placed on the record, Judge Peter E. Warshaw, Jr., denied defendant's motion. Finding Mahan had testified "in a highly credible manner," Judge Warshaw characterized him as being "truthful, forthcoming and worthy of belief." Although he believed defendant to be "credible in some aspects," Judge Warshaw concluded defendant "in certain critical areas . . . intend[ed] through his testimony to deceive and . . . was not worthy of belief on certain very critical issues." For example, he "emphatically" did not believe defendant's denial of discarding anything from his vehicle.

Judge Warshaw held the State had proven the validity of the vehicle stop, establishing the detectives had an articulable and reasonable suspicion that a criminal or motor vehicle violation had occurred. Based on Mahan's account of how these events developed, Judge Warshaw found the detectives had "multiple articulable bases" to stop defendant's vehicle. The detectives witnessed defendant stop the car and discard a dark object, which they quickly identified

as a handgun, giving them "even more reason to stop the car." Based on these findings, Judge Warshaw concluded defendant had abandoned the handgun and that the ammunition was "clearly acquired by search incident to arrest."

In this appeal, defendant argues:

> THE POLICE DID NOT HAVE REASONABLE SUSPICION TO STOP DEFENDANT'S CAR BASED UPON VAGUE INFORMATION THAT A BLACK CAR WITH TINTED WINDOWS HAD BEEN INVOLVED IN A SHOOTING AND THAT DEFENDANT HAD TURNED HIS HEAD WHEN AN OFFICER SHINED HIS FLASHLIGHT IN HIS EYES. ACCORDINGLY, THE MOTION TO SUPPRESS SHOULD HAVE BEEN GRANTED.

Generally, we uphold a trial court's factual findings made in connection with a motion to suppress when "those findings are supported by sufficient credible evidence in the record." State v. Gamble, 218 N.J. 412, 424 (2014). We defer to a trial court's factual findings because they are "informed by [the court's] first-hand assessment of the credibility of the witnesses." State v. Lentz, 463 N.J. Super. 54, 67 (App. Div. 2020); see also State v. S.S., 229 N.J. 360, 380 (2017) (noting criminal-part trial judges routinely hear and decide suppression motions and "have ongoing experience and expertise in fulfilling the role of factfinder"). "[A] trial court's factual findings should not be overturned merely because an appellate court disagrees with the inferences

A-4026-18

drawn and the evidence accepted by the trial court," S.S., 229 N.J. at 374, but only if the findings are "so clearly mistaken that the interests of justice demand intervention and correction," Gamble, 218 N.J. at 425 (quoting State v. Elders, 192 N.J. 224, 244 (2007)). We review a trial court's conclusions of law de novo. S.S., 229 N.J. at 380.

The United States Constitution and New Jersey Constitution forbid law enforcement from conducting unreasonable searches and seizures. State v. Terry, 232 N.J. 218, 231 (2018). Reasonableness is determined "by assessing . . . the degree to which [the search] intrudes on an individual's privacy and, . . . the degree to which it is needed for the promotion of legitimate government interests." State v. Davila, 203 N.J. 97, 111 (2010) (quoting United States v. Knights, 534 U.S. 112, 118-19 (2001)).

A motor-vehicle stop is a seizure under the Fourth Amendment. State v. Atwood, 232 N.J. 433, 444 (2018). For a motor-vehicle stop to be lawful, the law-enforcement official must have a reasonable and articulable suspicion "a criminal or motor vehicle violation has occurred." Id. at 444. In determining whether a reasonable and articulable suspicion exists, courts must consider all the circumstances in their totality rather than "looking at each fact in isolation." State v. Nelson, 237 N.J. 540, 554-55 (2019). Law enforcement must point to

7

"specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." State v. Robinson, 228 N.J. 529, 544 (2017) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)). As part of its reasonable-suspicion analysis, a court may consider the background and training of the law-enforcement officers, recognizing the officers "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Nelson, 237 N.J. at 555 (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). "[R]aw, inchoate suspicion grounded in speculation cannot be the basis for a valid stop." State v. Scriven, 226 N.J. 20, 34 (2016).

Considering the totality of the circumstances, Judge Warshaw correctly determined the detectives had a reasonable and articulable suspicion to stop defendant's vehicle. Defendant's appeal is premised on a futile attempt to parse out the facts in a stand-alone fashion rather than consider them, as we must, in their totality. As Judge Warshaw found, the detectives had "multiple articulable bases" for the stop. They pulled defendant's vehicle over not simply because it was dark-colored with tinted windows but also because it was coming from an area where gunfire had been detected, defendant had engaged in evasive behavior, and defendant had discarded a black object from the vehicle, which

they later confirmed was a gun. With that information and based on those observations, the detectives did not need to know the make and model of the vehicle to form an articulable and reasonable suspicion that a criminal violation had occurred.

Defendant's contention that Mahan conducted "a de facto stop of defendant's car on Oakland Street" is not supported legally or factually. "[A] seizure occurs 'only when, by means of physical force or a show of authority, [the suspect's] freedom of movement is restrained' and 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" State v. Tucker, 136 N.J. 158, 164 (1994) (quoting United States v. Mendenhall, 446 U.S. 544, 553-54 (1980)). Shining a flashlight and making a U-turn are not showings of physical force or authority and did not restrain defendant's freedom of movement. In fact, defendant continued to drive after Mahan had shined the flashlight into his vehicle, after Mahan had made the U-turn, and after Mahan had pursued him when he discarded and abandoned the gun.

In this light, we discern no legal basis to question the validity of Judge Warshaw's factual findings and ultimate conclusions of law.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4026-18