**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0864-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

KEVIN LAMBERT,

     Defendant-Appellant.

_____

> Argued January 9, 2024 – Decided February 22, 2024
>
> Before Judges Whipple, Enright and Paganelli.
>
> On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment Nos. 19-05-0749 and 21-06-0523.
>
> Rachel A. Neckes, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Rachel A. Neckes, of counsel and on the brief).
>
> David Michael Liston, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County Prosecutor, attorney; David Michael Liston, of counsel and on the brief).

PER CURIAM

Defendant Kevin Lambert appeals from a December 17, 2019 order denying his motion to suppress evidence seized during a motor vehicle stop. He also challenges his convictions and consecutive sentences under two judgments of conviction (JOCs) dated October 6, 2021. One JOC resulted from a 2021 jury trial; the other was based on defendant's guilty plea to a charge under a 2021 indictment. We affirm the December 17 order and the October 6 JOC based on the guilty plea. However, we reverse the conviction resulting from defendant's jury trial, and remand for a new trial. We also vacate the sentence imposed under the October 6 JOC related to defendant's trial conviction.

I.

On May 7, 2019, a Middlesex County grand jury returned Indictment No. 19-05-00749, charging defendant with third-degree possession of a controlled dangerous substance (CDS), N.J.S.A. 2C:35-10(a)(1). His co-defendants, Shaiwan, Tashien, and Leonard Edwards were charged under the same indictment.[1]

Defendant filed a motion to suppress evidence that was recovered on the

---

[1] Because the co-defendants share the same surname, we refer to them by their first name. We intend no disrespect by doing so. None of the co-defendants are involved in this appeal.

A-0864-21

date of his arrest following a motor vehicle stop. On December 17, 2019, the trial court conducted a testimonial hearing on the motion. The State called Officers Justin Miller and Jose Gomez to testify. Defendant testified on his own behalf.

Officer Miller testified he was working for the New Brunswick Police Department (NBPD) and handling narcotics investigations in the Street Crimes Unit (SCU) on the day of defendant's arrest. He estimated he conducted over 100 such investigations. One investigation by the NBPD led to the issuance of a search warrant for Apartment 3A at 55 Reservoir Avenue in New Brunswick, and another search warrant for Leonard.

On the morning of February 15, 2019, at approximately 6:00 a.m., Miller initiated surveillance in an unmarked vehicle at the apartment complex at 55 Reservoir Avenue. Miller had "received information that . . . drug activity would begin around six o'clock in the morning" outside Apartment 3A. Two officers from his squad were parked in an unmarked vehicle within two blocks of the complex; two other officers were stationed in an unmarked vehicle the same distance away, but in the opposite direction.

Miller testified that after he began surveilling the apartment complex, he saw Leonard's son, Shaiwan, conduct multiple hand-to-hand transactions with

people whom Miller suspected were buying drugs. Miller noted the transactions were "very short" in duration.

Miller also testified he observed a maroon Ford Expedition drive up to the "main entrance door that . . . [led to] Apartment 3A," where "Shaiwan was waiting" in the foyer. Miller stated he could see into the Expedition, noting "[t]he sun was out" and the weather was "[d]ry and clear." Miller recognized defendant as the driver of the vehicle because defendant "was . . . known to [him]."

Next, Miller testified he saw Shaiwan exit the building, enter defendant's car from the passenger side, "lean over toward . . . [defendant] as if he[ was] handing [defendant] something, and [Shaiwan and defendant] exchange[d] a couple of words." Shaiwan then exited the Expedition and defendant drove away. Miller estimated the two men were together for "[t]hirty seconds to a minute," which he considered "a short period of time." Miller stated he could not see "what, if anything, [wa]s actually . . . handed off" between Shaiwan and defendant, but he saw Shaiwan's "body move over, as if he[ was] leaning . . . towards the driver."

After Shaiwan went back inside the apartment building, Miller informed two of his squad members, Sergeant William Oels and Officer Jose Gomez,

about his observations. Miller also told them defendant's car was heading in their direction. Sergeant Oels and Officer Gomez immediately effectuated a motor vehicle stop and reported back to Miller "that they found heroin in the vehicle."

Prior to defendant testifying, his attorney advised the court that defendant only challenged the lawfulness of the stop, not the location of the drugs found in his vehicle. When his direct examination commenced, defendant admitted he drove to 55 Reservoir Avenue on February 15, 2019, explaining he went there "to go tell him about a job." Defense counsel asked defendant to clarify who defendant spoke to about a job. Defendant answered, "I forgot his name. I . . . just met him, and he told me where he live[d]." Defendant continued, "I don't know his name. I can't remember his name." He added:

> all I know[,] . . . that's his father. He came to me one day. He wanted a job. . . . I got information. The job said they w[ere not] hiring. . . . I went to his house[ and] I told him that. He got in the car. He got out. I drove off. The police pull[ed] me over.

On cross-examination, defendant conceded he phoned Shaiwan before he arrived at the Reservoir Avenue apartment complex and told Shaiwan that he was "on [his] way." Defendant testified, "that[ is] why [Shaiwan] knew to come out when" defendant arrived at the complex. When the assistant prosecutor

5

asked defendant if he "could have told [Shaiwan] about the job on the phone," defendant answered,

> I could have told him about the job on the phone, but I did[ not] want to . . . .  I just said, come out, I'm going to tell you about the job. . . .  I could have d[one] a lot of things on the phone, but I did[ not] want to tell him on the phone.

Officer Gomez testified on rebuttal.  He stated that based on his assignment to the NBPD's SCU, his unit was "conducting a search warrant at 55 Reservoir Avenue" on the morning of February 15, 2019.  He recalled that he and Sergeant Oels were parked "a couple of blocks away[,] . . . waiting for further . . . instructions" while Officer Miller was surveilling the apartment complex.  Gomez testified Miller subsequently informed him "that he [had] just seen a transaction between [defendant] and . . . Shaiwan . . . and that [defendant] was heading towards [Gomez's] direction."  Gomez and Sergeant Oels promptly effectuated a motor vehicle stop of defendant's vehicle.

Oels asked defendant for his license, registration, and insurance.  According to Gomez, Oels then saw defendant reach with his right hand toward the glove box to retrieve his documents, while using "his left hand . . . [to] stuff[] a brick of heroin between the seats and the center console."  Oels ordered defendant out of the vehicle.  While Gomez detained defendant, Oels recovered

6

the brick of heroin "[f]rom . . . between the center console and . . . the driver's seat."

On cross-examination, defense counsel asked Gomez if he recalled what Officer Miller told him before Gomez and Oels effectuated the motor vehicle stop. Gomez testified he "remember[ed] clearly that Miller saw a transaction between [defendant] and . . . [NBPD's] target." Gomez also stated he did not "know what . . . Miller saw" because Gomez "was[ not] there."

The judge credited the testimonies of Officers Miller and Gomez, noting their statements were, "in part, corroborated by the testimony of [defendant] in terms of what the officers ultimately observed." The judge found that on the date of defendant's arrest, the officers were "conducting surveillance . . . based upon information . . . they had been provided" about activity "in the area of 55 Reservoir Avenue, more specifically Apartment 3[]A." Further, she determined "the reason for the early surveillance was based upon . . . information that there was, in fact, drug activity or suspected drug activity that began around that hour." Additionally, the judge found Officer Miller "observed what he believed to be a hand[-]to[-]hand transaction . . . based upon what he saw to be body movements within [defendant's] vehicle and there was some conversation that was relatively short[,] . . . anywhere from [thirty] seconds to a minute," between

7

Shaiwan and defendant.

Moreover, the judge credited Officer Miller's testimony that he believed Shaiwan "was, in fact, selling drugs from that particular location." She also accepted Miller's testimony that NBPD's SCU

> received a call from a concerned neighbor . . . informing [the police] that [between] approximately . . . six and seven [a.m.,] there were a lot of individuals selling and purchasing narcotics from that . . . location. That time . . . and location correspond[ed] with the time and location that . . . defendant's Ford Expedition was in the area, and . . . the officer[] observed Shaiwan . . . getting in and out of . . . defendant's vehicle in a very short period of time.
>
> . . . .
>
> . . . [T]he observations of the police . . . were consistent with[—]based upon their training and experience[—]narcotic[]s activities, buyers[] and sellers exchanging narcotics[,] and that interaction [was] a relatively short one, which was what [defendant] also described.
>
> I don't find credible, however, . . . defendant's explanation as to why he was at that particular location. . . . [D]efendant[] show[ed] up at the very time that buyers [we]re essentially coming into the area to obtain drugs. I don't find that it's merely a coincidence that he happened to be there at that particular location at that particular time, and for that duration. It [is] . . . not credible.
>
> The [c]ourt finds that based upon the observations of the officers, the fact that they were

8

conducting surveillance for drug transactions when this defendant arrived on the scene, the totality of all of the circumstances that exist in this case, which are really not disputed, those circumstances provide[d] probable cause for the officer[s'] . . . stop and search of this defendant's vehicle.

Moreover, the circumstances giving rise to probable cause were unforeseeable. This defendant was, in no way, the target of the investigation that was happening separately when he just happened to drive into that particular area on that particular morning, essentially, . . . as the [c]ourt finds[,] . . . to, in fact, make a purchase.

So [the stop and search] was unforeseeable [and] spontaneous. The[ police] were not expecting this defendant to drive into that area, for Shaiwan . . . to enter and exit [defendant's] vehicle during their investigation. And, so, for all of these reasons[,] the motion to suppress is appropriately denied.

In June 2021, a Middlesex County grand jury returned Indictment No. 21-06-00523, charging defendant with: third-degree possession with intent to distribute CDS, N.J.S.A. 2C:35-5(b)(3); and third-degree possession of CDS.

Two months later, defendant's trial under Indictment No. 19-05-00749 commenced. The judge who presided over his suppression hearing also presided over defendant's trial. Prior to opening statements, the State asked the judge to grant its motion to admit defendant's prior convictions for the purpose of impeachment. The judge stated she was "waiting for a response from the

defense," but her "intentions were to allow [the State] only to use [defendant's] most recent" conviction from 2017. The judge noted defendant had "priors dating back to 1989," and asked if defense counsel wished to be heard on the motion. Counsel stated the judge's decision was "fair," but he argued the 2017 conviction should be "sanitized" so the jury would be told only about the date and degree of the 2017 conviction, as well as the sentence defendant received. The State and the judge agreed to these requests.

During the trial, Officers Miller and Gomez testified consistent with their testimony at the suppression hearing. After the State rested, it asked the judge to reconsider her decision to admit only defendant's 2017 conviction for the purpose of impeachment if he testified. Specifically, the State argued the judge should admit his convictions from the following JOCs:

> March 8, 1989 for third-degree theft from person, N.J.S.A. 2C:20-3;
>
> March 4, 1992, for third-degree possession of CDS, N.J.S.A. 2C:35-10(a)(1); third-degree possession with intent to distribute, N.J.S.A. 2C:35-5(a)(1), N.J.S.A. 2C:35-5(b)(3); and third-degree possession of CDS with intent to distribute in a school zone, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-7;[2]

---

[2] At defendant's March 4, 1992 sentencing, the two third-degree possession and distribution charges were merged with the distribution in a school zone charge.

November 4, 2002, for fourth-degree contempt, N.J.S.A. 2C:29-9;

November 4, 2002, for third-degree possession of CDS with intent to distribute in a school zone;[3]

June 7, 2007, for third-degree possession of weapons for unlawful purposes, N.J.S.A. 2C:39-4(d); and

July 7, 2017 for third-degree manufacture and distribution of a CDS, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(3).[4]

The State argued "every single conviction should come in, because there [was] no" ten-year period in defendant's life when he was not "committing and [being] convicted of crimes." The judge responded, "I think I might be persuaded by that argument." Defense counsel objected to any reconsideration

---

[3] The State also sought to include the JOCs from defendant's re-sentencings on this conviction from August 2004 and December 2005.

[4] The 2017 conviction resulted from a 2012 jury trial. Following that trial, defendant was convicted of various drug and weapons offenses. Defendant successfully appealed from his convictions and sentence, and we ordered a new trial. State v. Lambert, No. A-2698-12 (App. Div. April 9, 2015) (slip op. at 10). On remand, he pled guilty to third-degree possession of CDS with intent to distribute and fourth-degree possession of a prohibited weapon, N.J.S.A. 2C:39-3(h). State v. Lambert, No. A-1996-15 (App. Div. June 5, 2017) (slip op. at 2). He again appealed and we vacated the prohibited weapon conviction and remanded for resentencing on the distribution charge. Id. at 3. Defendant was resentenced for this offense in July 2017. Therefore, at defendant's August 2021 trial, the trial judge and counsel stipulated to treating this conviction as a 2017 conviction.

of the judge's prior decision and argued "the prejudicial value [of admitting all of defendant's prior convictions wa]s so much higher than the probative value," because defendant's convictions before 2017 were "very remote."

The judge granted the State's reconsideration application. She explained that although defendant's 1989 and 1992 convictions were remote, he had "a number of convictions" between 1989 and 2017 and served prison sentences for what she "perceive[d] to be serious charges." The judge also found defendant served "sentences on crimes that were not only third-degree, but second-degree offenses as well." Further, the judge concluded, "to suggest to the jury that [defendant] had perhaps one prior in 2017, when in fact[,] he ha[d] a slew of them and . . . continued to . . . pick up new offenses, . . . would not[,] in fact[,] represent truly to this jury who [defendant] is." Thus, she stated, "all of these offenses come in if [defendant] chooses to testify." However, the judge also directed that defendant's prior convictions would "be sanitized" to reflect only "the date [and] degree [of the offense] and the sentence."

Defense counsel asked for time to speak with defendant, telling the judge that her mid-trial ruling "kind of dera[iled defendant's] strategy," and counsel was "surprised." Before counsel conferred with defendant, the judge advised defendant he had the right to testify or "exercise [his] right not to testify."

12

Defendant told the judge he understood his options and "want[ed] to testify." He reiterated that desire at least twice more and stated he was "not going to change [his] mind." The judge advised defendant he was "not bound by anything [he] just told [her]," and he "might want to have a talk with [his attorney] before [he] ma[de his] decision."

After speaking with counsel, defendant elected not to testify. He then called John McMahon, a defense investigator, as his only witness. McMahon testified he interviewed defendant's acquaintance, Ashley Chalfant, by phone prior to trial, and Chalfant admitted she drove defendant's Expedition the night before defendant was arrested in February 2019. McMahon also testified that Chalfant admitted to purchasing heroin the night before defendant's arrest, dropping a brick of heroin in the Expedition, and forgetting to remove the brick before returning the car to defendant. On cross-examination, McMahon admitted he never met Chalfant face-to-face but used her birthdate and mailing address to confirm her identity when the two spoke over the phone.

During closing arguments on August 6, 2021, the assistant prosecutor told jurors to "scrutinize" McMahon's testimony, just as defense counsel asked them "to scrutinize the [S]tate's witnesses." The assistant prosecutor further informed jurors that McMahon was "a biased witness" who received "all of his

information from the defense and . . . did absolutely no investigation and no follow up." Additionally, the assistant prosecutor stated that even if the jury assumed Chalfant made the statements McMahon attributed to her, Chalfant did "nothing more than giv[e] a statement to try to help out a friend," which was "not worthy of belief." Defense counsel did not object to these comments. Later that day, the jury found defendant guilty of third-degree possession of CDS.

On September 15, 2021, defendant pled guilty under Indictment No. 21-06-00523 to third-degree possession with intent to distribute CDS, in exchange for the State's recommendation that the court dismiss his remaining three charges and impose a four-year sentence to run consecutively to the sentence he would receive under Indictment No. 19-05-00749. During his plea colloquy, defendant testified he understood the terms of the plea agreement, he did not "want to go to trial," he had a chance to "review . . . discovery with [his] attorney," and he was "pleading guilty to th[e CDS] charge because [he was] guilty of th[at] charge." Further, defendant stated he was satisfied with his attorney's services. After defendant provided a factual basis for his guilty plea, the judge found he entered the plea "freely and voluntarily," "understanding the nature and consequences of the plea."

On October 6, 2021, the judge sentenced defendant under both

14

indictments. The judge found aggravating factors three (risk of reoffense), six (criminal history), and nine (need to deter), N.J.S.A. 2C:44-1(a)(3), (6), (9), which she "weighed heavily." Next, the judge rejected defendant's request that she find mitigating factors eight (defendant's conduct was a result of circumstances unlikely to recur), nine (defendant's character and attitude made it unlikely he would commit another offense), ten (amenability to probationary treatment) and eleven (excessive hardship), N.J.S.A. 2C:44-1(b) (8), (9), (10), and (11). She also found defendant "appear[ed] to have issues with substance abuse," and that despite being indicted in 2019, he incurred additional charges under a second indictment. She concluded such conduct was "a clear indication that there's a risk of re[]offense." The judge sentenced defendant to a four-year flat term on his trial conviction for third-degree possession of CDS and a consecutive four-year flat term on his distribution charge, consistent with his plea agreement.

## II.

On appeal, defendant raises the following arguments:

POINT I

THE MOTION COURT'S DECISION MUST BE REVERSED AND THE PHYSICAL EVIDENCE SEIZED MUST BE SUPPRESSED BECAUSE THE OFFICER LACKED THE REQUISITE

15

REASONABLE SUSPICION TO CONDUCT AN INVESTIGATORY STOP.

POINT II

THE TRIAL COURT'S LAST MINUTE, ERRONEOUS DECISION THAT DEFENDANT'S DECADES-OLD PRIOR CONVICTIONS WERE ADMISSIBLE FOR IMPEACHMENT REQUIRES REVERSAL.

A. THE TRIAL COURT ERRED BECAUSE IT RELIED UPON INCORRECT INFORMATION, INCLUDING CONVICTIONS VACATED ON APPEAL AND DISMISSED CHARGES, TO ADMIT FIVE PRIOR CONVICTIONS, FATALLY ALTERING THE [N.J.R.E.] 609 ANALYSIS.

B. THE TRIAL COURT'S LAST-MINUTE REVERSAL OF ITS [N.J.R.E.] 609 DECISION VIOLATED MR. LAMBERT'S RIGHT TO PREPARE A DEFENSE.

C. THE ERROR IS NOT HARMLESS.

POINT III

THE PROSECUTOR ENGAGED IN REVERSIBLE MISCONDUCT WHEN SHE DISPARAGED THE DEFENSE AND THE ONLY DEFENSE WITNESS.

POINT IV

THE CUMULATIVE EFFECT OF THE ERRORS REQUIRES THAT MR. LAMBERT'S TRIAL CONVICTIONS BE REVERSED.

A-0864-21

POINT V

RESENTENCING IS REQUIRED BECAUSE THE
TRIAL COURT FAILED TO FIND MITIGATING
FACTORS ONE AND TWO AND, IN IMPOSING
CONSECUTIVE TERMS, FAILED TO
ADEQUATELY EVALUATE THE YARBOUGH[5]
FACTORS OR THE FAIRNESS OF THE OVERALL
SENTENCE.

    A. RESENTENCING IS REQUIRED BECAUSE
THE COURT FAILED TO FIND MITIGATING
FACTORS ONE AND TWO, WHICH WERE WELL-
SUPPORTED BY THE RECORD.

    B. RESENTENCING IS REQUIRED BECAUSE
THE SENTENCING COURT FAILED TO FOLLOW
THE MANDATES OF YARBOUGH AND TORRES[6]
IN IMPOSING CONSECUTIVE SENTENCES.

First, we note the State concedes "[d]efendant is correct that his 1992

conviction[s] w[ere] reversed and the charge[s were] eventually dismissed."  In

fact, we reversed defendant's March 1992 convictions and remanded for a new

trial in 1994.  See State v. Lambert, 275 N.J. Super. 125, 134 (App. Div. 1994).

Moreover, the record reflects the charges resulting in the March 1992

convictions were dismissed at the State's request in August 1994.  Accordingly,

we agree with defendant's contention under Points II.A and II.C that, when the

---

[5]  State v. Yarbough, 100 N.J. 627 (1985).

[6]  State v. Torres, 246 N.J. 246 (2021).

A-0864-21

judge conducted her Rule 609(b) analysis, she relied, in part, on misinformation she received about the March 1992 JOC, and not only mistakenly considered convictions that were reversed on appeal, but charges that were ultimately dismissed. Because this was not harmless error, we are constrained to reverse defendant's conviction under the 2019 indictment, vacate the corresponding sentence imposed, and remand for a new trial. Based on this disposition, we do not reach defendant's remaining arguments under Point II, nor the arguments raised under Points III, IV and V, except to state that defendant's argument under Point V.A lacks merit. R. 2:11-3(e)(2). Accordingly, we confine our discussion to defendant's suppression and Rule 609(b) arguments.

An appellate court must uphold a trial court's findings on a suppression motion if they are supported by "sufficient credible evidence in the record." State v. Lamb, 218 N.J. 300, 313 (2014). This deference is applicable regardless of whether there was a testimonial hearing, or whether the court based its findings solely on its review of documentary evidence. State v. Johnson, 42 N.J. 146, 161 (1964); State v. S.S., 229 N.J. 360, 381 (2017). We typically will not reverse a trial court's findings of fact unless the findings are clearly erroneous or mistaken. S.S., 229 N.J. at 381. But a trial court's legal conclusions are

reviewed de novo. State v. Dorff, 468 N.J. Super. 633, 644 (App. Div. 2021) (citing S.S., 229 N.J. at 380).

"To lawfully stop a motor vehicle, 'a police officer must have a reasonable and articulable suspicion that the driver of a vehicle . . . is committing a motor-vehicle violation or a criminal or disorderly persons offense.'" State v. Nyema, 465 N.J. Super. 181, 190 (App. Div. 2020) (quoting State v. Scriven, 226 N.J. 20, 33-34 (2016)). "Accordingly, an investigatory stop is permissible 'if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity.'" Ibid. (quoting State v. Chisum, 236 N.J. 530, 545-46 (2019)). In addressing whether reasonable and articulable suspicion exists for an investigatory stop, a trial court "must 'evaluate the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions.'" State v. Privott, 203 N.J. 16, 25-26 (2010) (quoting State v. Davis, 104 N.J. 490, 504 (1986)).

The reasonable suspicion inquiry considers an officer's background and training and permits the officer "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative

information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)). "Reasonable suspicion necessary to justify an investigatory stop is a lower standard than the probable cause necessary to sustain an arrest." State v. Stovall, 170 N.J. 346, 356 (2002).

"Both the United States Constitution and the New Jersey Constitution guarantee an individual's right to be secure against unreasonable searches or seizures." State v. Minitee, 210 N.J. 307, 318 (2012) (citing U.S. Const. amend. IV; N.J. Const. art. 1 ¶ 7). "[S]earches and seizures conducted without warrants issued upon probable cause are presumptively unreasonable and therefore invalid." State v. Goldsmith, 251 N.J. 384, 398 (2022) (quoting State v. Elders, 192 N.J. 224, 246 (2007)).

To overcome the presumption that a warrantless search is unlawful, "the State bears the burden of proving by a preponderance of the evidence not only that the search or seizure was premised on probable cause, but also that it f[ell] within one of the few well-delineated exceptions to the warrant requirement." State v. Bryant, 227 N.J. 60, 69-70 (2016) (alteration in original) (quoting State v. Johnson, 193 N.J. 528, 552 (2008)). Evidence seized when found in plain view following a lawful traffic stop is one such exception. State v. Gonzales,

227 N.J. 77, 82 (2016).  In fact,

> [f]ollowing the Court's decision in Gonzales, police may seize contraband in plain view and without a warrant if two requirements are met:  (1) they are lawfully in the viewing area when observing and seizing the evidence; and (2) the incriminating nature of the evidence is "immediately apparent" to the officers.
>
> [State v. Washington, 475 N.J. Super. 292, 301-02 (App. Div. 2023) (quoting Gonzales, 227 N.J. at 101).]

Another exception to the warrant requirement is the automobile exception. State v. Cohen, 254 N.J. 308, 319-20 (2023) ("'[W]hen the police have probable cause to believe that [a] vehicle contains contraband or evidence of an offense and the circumstances giving rise to probable cause are unforeseeable and spontaneous,' law enforcement may search the vehicle without first obtaining a warrant.") (second alteration in original) (quoting State v. Witt, 223 N.J. 409, 447 (2015)).  Probable cause "requires 'a practical, common sense determination whether, given all of the circumstances, there is a fair probability that contraband or evidence of a crime will be found.'"  State v. Myers, 442 N.J. Super. 287, 301 (App. Div. 2015) (quoting State v. Moore, 181 N.J. 40, 46 (2004)).

Governed by these standards, we discern no basis to disturb the trial judge's December 17, 2019 order denying defendant's suppression motion.

A-0864-21

Thus, we affirm the suppression decision, in part, for the reasons expressed by the judge and, in part, for other reasons. See State v. Heisler, 422 N.J. Super. 399, 416 (App. Div. 2011) (noting a reviewing court is free to affirm "on grounds different from those relied upon by the trial court"). In short, while we agree with the judge that the motor vehicle stop was lawful, we affirm based on the lesser standard of reasonable and articulable suspicion governing the investigatory stop and based on the totality of circumstances detailed at length in the judge's comprehensive oral decision. We also conclude the subsequent seizure of heroin from defendant's vehicle was lawful under the plain-view exception, considering he did not challenge the location of the heroin Sergeant Oels found in defendant's vehicle.

Next, we consider the principles compelling us to reverse defendant's trial conviction based on the judge's flawed analysis under N.J.R.E. 609(b). It is well settled that we apply a deferential standard of review to a trial court's decision to permit the State to use prior criminal convictions for impeachment. State v. T.J.M., 220 N.J. 233-34 (2015). "However, we do not defer to a ruling that is based on a mistaken interpretation of an evidence rule, or that misapplies the rule." State v. R.J.M., 453 N.J. Super. 261, 266 (App. Div. 2018).

"Only convictions of crimes may be used to affect credibility." State v.

Burgos, 262 N.J. Super. 1, 5 (App. Div. 1992). But "a conviction under appeal may not be used to impeach [a] defendant's credibility at trial." State v. Williams, 299 N.J. Super. 264, 274 (App. Div. 1997) (citing State v. Blue, 129 N.J. Super. 8, 12 (App. Div. 1974)). As the Blue Court reasoned, it is "fundamentally unfair to permit the use of a prior conviction to impeach credibility while the very credibility of this conviction itself is under attack through the appellate process." Blue, 129 N.J. Super. at 12. "Likewise inadmissible for impeachment purposes is 'evidence concerning criminal charges that were dismissed as part of a plea agreement,'" because "a 'criminal charge is more akin to an arrest since the defendant was never convicted of a crime.'" Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 2 on N.J.R.E. 609 (2023-2024) (quoting Burgos, 262 N.J. Super. at 5). Additionally, pertinent to this appeal, "[i]f other crimes charged, but dismissed, are included on a judgment of conviction, those other crimes charged may not be inquired into for purposes of affecting credibility." Burgos, 262 N.J. Super. at 5.

We also are mindful that prior to 2014, Rule 609 presumptively admitted prior criminal convictions for impeachment purposes "unless excluded by the judge as remote or for other causes." State v. Harris, 209 N.J. 431, 442 (2012) (quoting N.J.R.E. 609 (2012)). The Court in Harris recognized a significant

difference between the Rule and the Federal Rules of Evidence (F.R.E.) 609, which limited the use of any conviction that was more than ten years old. Id. at 444. The Court then referred "[t]he question of whether N.J.R.E. 609 should be modified . . . to the Supreme Court Committee on Evidence." Id. at 445.

The Committee on the Rules of Evidence recommended significant changes to the Rule, which were subsequently adopted by the Court effective July 1, 2014, and have remained largely unchanged since.[7] See Biunno et al., cmt. 1 on N.J.R.E. 609. Under its current iteration, any witness's credibility may be presumptively impeached through prior convictions under subsection (a) of the Rule, subject only to exclusion under N.J.R.E. 403 or subsection (b).

Admission of a conviction more than ten years old triggers a different analysis under subsection (b), which provides:

Use of Prior Conviction Evidence After Ten Years.

(1) If, on the date the trial begins, more than ten years have passed since the witness's conviction for a crime or release from confinement for it, whichever is later, then evidence of the conviction is admissible only if the court determines that its probative value outweighs its prejudicial effect, with the proponent of that evidence having the burden of proof.

---

[7] Minor "restyling" amendments to the Rules of Evidence effective July 1, 2020, do not affect our analysis, and we use the current version of the Rule in this opinion.

(2) In determining whether the evidence of a conviction is admissible under subparagraph (b)(1) of this rule, the court may consider:

> (i) whether there are intervening convictions for crimes or offenses, and if so, the number, nature, and seriousness of those crimes or offenses,

> (ii) whether the conviction involved a crime of dishonesty, lack of veracity, or fraud,

> (iii) how remote the conviction is in time, [and]

> (iv) the seriousness of the crime.

[N.J.R.E. 609(b).]

"However, making findings as to those four factors is not enough. The court must then engage in the weighing process under (b)(1), to determine whether the State has carried its burden of proving that evidence of the remote conviction would not be more prejudicial than probative." R.J.M., 453 N.J. Super. at 270 (citing N.J.R.E. 609 (b)(1)).

Here, all of defendant's prior convictions—except for the inadmissible reversed 1992 convictions and his 2017 conviction—were subject to subsection (b) of the Rule because they were potentially admissible and more than ten years old when the trial began. Thus, the judge was required to initially determine whether the State demonstrated that the probative value of defendant's potentially admissible and remote prior convictions "outweigh[ed] its

prejudicial effect." N.J.R.E. 609(b)(1). To make this assessment, the judge would have been guided by the non-exhaustive list of factors "the court may consider" as set forth in N.J.R.E. 609(b)(2), the first of which is "whether there are intervening convictions for crimes or offenses." N.J.R.E. 609(b)(2)(i). The judge also could have considered "the number, nature, and seriousness of those [intervening] crimes." N.J.R.E. 609(b)(2)(i). Through no fault of the judge, she did not know the true number, nature, and dates of defendant's convictions. That lack of knowledge triggered her flawed analysis under N.J.R.E. 609(b). On this record, we cannot conclude this error was harmless, particularly given defendant's professed desire to testify at trial before he consulted with counsel and ultimately declined to do so.

Our Supreme Court cautioned in State v. Hedgespeth, 249 N.J. 234, 250 (2021) that "there can be situations, although likely unusual, in which an erroneous N.J.R.E. 609 ruling may be deemed harmless even if that ruling resulted in the defendant's deciding not to testify." (Emphasis added) (citing State v. Whitehead, 104 N.J. 353, 359-60 (1986)). In reaching this conclusion, the Court rejected the defendant's argument that "an erroneous ruling that pushes a criminal defendant not to testify can never be harmless," id. at 247, and instead reaffirmed "that in limine N.J.R.E. 609 rulings shall continue to be reviewed

A-0864-21

under the harmless-error standard," id. at 252. The Court said, "[t]o determine whether admission of evidence constitutes harmless error, the relevant inquiry is whether the purported error 'is of such a nature as to have been clearly capable of producing an unjust result.'" Ibid. (quoting State v. Kuchera, 198 N.J. 482, 501 (2009)).

The Hedgespeth Court further assessed whether "the jury's failure to hear defendant's testimony could have produced an unjust result." Ibid. The Court concluded the trial court's ruling that the State could impeach the defendant with his two prior convictions was harmful error, explaining:

> The key testimony against defendant was that of two police officers who testified that they saw the gun in defendant's waist[]band and that a gun was later recovered by other officers near where defendant and others were apprehended. The State introduced the gun itself into evidence; however, there was no fingerprint or DNA evidence on the gun.
>
> Had the trial court not erroneously admitted the prior convictions, defendant argues he could have more forcefully challenged the detectives' credibility as to whether they saw the gun on his waistband. By not testifying, defendant was only able to cast doubt on the officers' accounts through cross-examination; he was unable to effectively offer a counter theory of the case. Moreover, the jury was not able to consider Hedgespeth's demeanor and credibility in delivering his theory of the case.

No doubt, the strongest evidence against defendant is that the State produced the gun in evidence. But, without indisputable evidence linking defendant to the gun—except through officer testimony—the admission of the gun did not necessarily cement the State's case against defendant. The mere fact that the State may characterize a potential defense theory seeking to explain away the gun as "implausible" is not reason to hold that the trial court's error was harmless. Determining implausibility "is in the sole province of the jury. Judges should not intrude as the thirteenth juror."

[Hedgespeth, 249 N.J. at 252-53 (first and third emphases added) (quoting State v. Scott, 229 N.J. 469, 485 (2017)).]

Considering the guidance provided by the Court in Hedgespeth, we are persuaded that here, the judge's Rule 609(b) analysis was not only impermissibly faulty, but deprived defendant of the opportunity "to effectively offer a counter theory of the case," the effect of which is not for us to judge. 249 N.J. at 252. Thus, the error was not harmless, and we are compelled to reverse defendant's trial conviction, vacate his sentence, and remand for a new trial.

Finally, to the extent defendant informally contends a reversal of his trial conviction entitles him to withdraw his guilty plea under Indictment No. 21-06-523, we disagree. Defendant specifically argues he "decided to plead guilty" to a distribution charge under the second indictment "only after he was convicted on Indictment No. 19-05-749," and "he would not have pleaded guilty if he had

not already been facing substantial prison time for his conviction, through a flawed trial." Preliminarily, we note this argument was raised in two succinct paragraphs in the latter section of defendant's brief, without a separate point heading, contrary to Rule 2:6-2(a)(6). "This kind of presentation of an issue for appellate review is improper." Mid-Atl. Solar Energy Indus. Ass'n v. Christie, 418 N.J. Super. 499, 508 (App. Div. 2011). Although we need not reach this issue, for the sake of completeness, we briefly address it.

Here, the record shows that the charges arising under defendant's second indictment resulted from an incident entirely separate from the incident leading to defendant's jury trial and conviction. Moreover, by the time defendant pled guilty under the second indictment, he not only had failed to prevail on his suppression motion under the first indictment, but had been convicted by a jury under the 2019 indictment. Fully aware of these circumstances, defendant chose to enter a guilty plea to the charge of third-degree possession of CDS with intent to distribute, in exchange for the State's recommendation that he serve a four-year prison term consecutive to the sentence he would serve on the 2019 indictment, with any remaining charges under the second indictment to be dismissed. The judge sentenced defendant consistent with the negotiated plea agreement after previously finding he knowingly and voluntarily entered into

the plea agreement.

"A trial judge's finding that a plea was voluntarily and knowingly entered is entitled to appellate deference so long as that determination is supported by sufficient credible evidence in the record." State v. Lipa, 219 N.J. 323, 332 (2014). "Once it is established that a guilty plea was made voluntarily, it may only be withdrawn at the discretion of the trial court." Ibid.

Here, the record is devoid of any evidence defendant formally moved to withdraw his plea. See State v. Slater, 198 N.J. 145, 150 (2009). Moreover, there is no evidence the errors we have highlighted from defendant's August 2021 trial had any bearing on his pleading guilty in September 2021 to the distribution charge under the second indictment. Thus, we discern no basis to vacate defendant's guilty plea, notwithstanding our reversal of his trial conviction.

Affirmed in part; reversed, remanded, and vacated in part for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION