# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1860-22
A-2152-22

J.T.,[1]

     Plaintiff-Appellant,

v.

A.S.A.,

     Defendant-Respondent.

_____

A.S.A.,

     Defendant-Appellant,

v.

J.T.,

     Plaintiff-Respondent.

_____

Submitted March 5, 2024 – Decided March 28, 2024

Before Judges Mayer and Enright.

---

[1] We refer to the parties by initials and pseudonyms to protect their privacy and preserve the confidentiality of these proceedings. R. 1:38-3(d)(9) and (10).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket Nos. FV-12-1697-23 and FV-12-1730-23.

Einhorn, Barbarito, Frost & Botwinick, PC, attorneys for J.T. (Bonnie C. Frost, Matheu D. Nunn, and Jessie M. Mills, on the briefs).

Jardim, Meisner & Susser, PC, attorneys for A.S.A. (Jessica Ragno Sprague, on the brief).

PER CURIAM

In these consolidated appeals[2] involving the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, J.T. (Jane) appeals from the dismissal of her domestic violence complaint against A.S.A. (Art) and Art appeals from the dismissal of his domestic violence cross-complaint against Jane. Under the idiosyncratic facts presented, we affirm the orders dismissing the parties' temporary restraining orders (TROs) and domestic violence complaints.

We recite the facts from the domestic violence trial. Jane and Art married in December 2017. The parties have one child, D.A. (Dan), born in 2019. The parties filed for divorce in 2020. One of the hotly contested issues in the divorce

---

[2] We consolidated the appeals in a May 8, 2023 order.

2

A-1860-22

action involved custody of Dan.[3]  The Family Part judge handling the divorce action issued an order granting Art parenting time "in his hotel suite . . . when [Art] is in New Jersey,"[4] with parenting time exchanges to occur at Art's hotel in Somerset.  At the time of the domestic violence trial, there had been approximately fifty days of trial testimony in the divorce action.[5]

On January 17, 2023, Jane filed for a TRO against Art alleging the predicate act of harassment.  In her domestic violence complaint, Jane stated she arrived at Art's hotel with her father (Grandfather) on January 17 for the scheduled parenting time exchange.  According to Jane, she "briefly put [Dan] down[,] who then walked to . . . [G]randfather to be held."  Jane claimed Art "became angry and . . . began shoving" her and Grandfather in an "attempt[] to take [Dan]."  Jane explained she "attempted to grab [Dan] from [Grandfather] and was again shoved by [Art]."  In the portion of the TRO application stating

---

[3]  After the parties filed their appellate briefs, but before the matter was calendared, the judge handling the divorce action entered a final judgment of divorce (JOD).  In a July 27, 2023 order, we denied Jane's motion to supplement the record with the JOD.

[4]  According to the record, Art lived and worked in California at the time.

[5]  The judge who handled the domestic violence matters was not the judge who handled the divorce action.

the prior history of domestic violence, Jane claimed Art yelled and cursed at her during a prior parenting time exchange on January 12, 2023.

Several days later, Jane amended her domestic violence complaint to include the following prior history of domestic violence: Art threw Jane's "items" on the floor on July 7, 2018; Art threatened to kill himself on July 8, 2018 "if [Jane] didn't do what he said"; Art threw a bowl of mangoes at Jane in October 2018; Art pushed Jane on May 18, 2019; Art "stood outside of [Jane's] car" and shouted on June 4, 2020; Art "stood in front of [Jane's] car" and cursed at her on December 27, 2020; and Art "repeatedly cursed at [Jane] . . . in front of [Dan] during their [parenting time] exchange" on December 11, 2023. Jane also asserted: Art "regularly call[ed] [her] names in front of [Dan]"; told Dan to "kick" her, "throw things at" her, and "hit" her; and "refer[red] to [her with] sexually abusive language" and "antagonize[d] [her] about their sex life in front of [Dan]."

The day before the February 8, 2023 domestic violence trial,[6] Jane again sought to amend her domestic violence complaint. On this occasion, she sought to add the predicate act of assault. However, the requested amendment was not

_____

[6] The original trial date scheduled for February 2 was adjourned at the request of counsel for the parties.

A-1860-22

processed by the court's staff in time for the trial scheduled to begin the following day. Thus, the judge never received Jane's amended pleading. In addition, there is no information in the record that Art received Jane's proposed amended domestic violence complaint.

On January 30, 2023, Art filed for a TRO against Jane, alleging the predicate act of harassment. In his domestic violence complaint, Art explained that immediately after the January 17 custody exchange, Dan walked to the elevator in Art's hotel and cried out for Art. Art stated he "approached [Dan] to console him" and Jane got between Art and Dan and "shoved [Art] with her shoulder, causing [Art] to fall on [the] floor."

In his domestic violence complaint, Art also provided a prior history of domestic violence. The prior incidents related to Jane involved yelling, cursing, and name calling. Art also described prior incidents between himself and members of Jane's family—specifically, Grandfather.

On February 8, 2023, the Family Part judge held a one-day trial on the parties' applications for the entry of final restraining orders (FROs). Because he was in California, Art participated virtually.

At the start of the trial, the judge stated he would first "hear the testimony with regard to the predicate acts."[7]  He explained that he would hear testimony regarding prior acts of domestic violence after "mak[ing] [a] determination on the predicate acts."  Neither party objected to proceeding in this manner.

Three people testified at trial.  Jane, Art, and a Franklin Township police officer hired by Jane to work off-duty as "security detail for the [parenting time] exchange" on January 17, 2023.

During his testimony, the officer described the events he observed during the January 17 parenting time exchange.  According to the officer, the child ran to Jane, but got "upset because he want[ed] to get on the elevator."  When Jane attempted to prevent her son from going on the elevator, the officer explained Jane and Grandfather "got closer to [Art]," who was "standing in front of the elevator."  Art told Grandfather to back away or Art would call the police.  Even though the officer was a member of the police force in Franklin where the hotel is located, the officer did not identify himself or intercede at that point.  The officer saw Jane pick up the child and walk toward the exit of the hotel.

---

[7]  Harassment was the only predicate act asserted in the parties' timely filed domestic violence complaints.

A-1860-22

According to the officer, Art repeatedly shouted "[T]his is my lobby" and "I'm going to call the police."

The officer explained that, instead of exiting the hotel, Jane and Grandfather "for some reason . . . just stop[ped]" and stared at Art. Although the officer testified Dan ran toward Grandfather, the video introduced as evidence during the trial showed Jane handing the child to Grandfather.

According to the officer, Art "bum-rush[ed]" Grandfather and "push[ed] him" while attempting to grab Dan from Grandfather. The officer described Jane as getting "in the middle of it" and "g[ot] pushed as well." At that point, the officer "intervene[d] and separate[d] everybody."

Then, Jane testified regarding the parenting time exchange on January 17, 2023. According to Jane, after Grandfather took Dan from her in the hotel lobby, Art shouted that he, not Grandfather, was Dan's father. According to Jane, Art lunged at Jane and Grandfather, pushing and shoving them. Jane testified Art "grabbed [Grandfather ] with . . . one arm," "grabbed . . . [her with] another arm," and shoved the two away from the hotel exit and back toward the hotel lobby. Jane explained Art "squeezed [her] in between" him and Grandfather, causing her to lose her balance and "practically fall[] down." Jane also testified

7

Art "struck [her] on [her] chest" and "grabb[ed] and pull[ed] her," causing injury to her chest and shoulder.

On cross-examination, Jane conceded she knew there were "issues when [Grandfather] and [Art] [we]re both at the dropoff" during parenting time exchanges. Jane also admitted Art filed motions in the divorce action to preclude Grandfather from accompanying Jane to parenting time exchanges.

At trial, Jane introduced a January 17, 2023 video recording from the hotel's surveillance camera.[8] The trial judge admitted the video recording as evidence and considered the video as part of his decision on the parties' domestic violence complaints. We describe the events captured on the video recording in detail because the recording presented an untainted and unbiased depiction of the parenting time exchange on January 17.

In the video recording, Jane and Grandfather entered the hotel lobby. Art approached Jane and Grandfather and placed a white plastic bag on the ground. Dan moved toward Jane and Grandfather and dragged them in the direction of Art, who stood in front of the elevator. Dan appeared to want to play on or near the elevator.

---

[8] The video recording had no accompanying audio.

Jane then lifted Dan and carried him toward the hotel's exit doors. Before exiting the hotel, Jane stopped and faced Art. Art stepped toward Jane, Dan, and Grandfather, and took out his cellphone. Jane continued to hold Dan. Dan reached for Grandfather, who took Dan from Jane.

Art moved toward Grandfather but Jane inserted herself between the two men. Art grabbed Grandfather's arm. Jane grabbed Art's arm. All three stumbled several steps. At this point in the video recording, the officer interceded and separated Art, Jane, and Grandfather.

Jane also presented an audio recording of the January 17 parenting time exchange. Grandfather made the recording on his cellphone. Portions of the audio recording were garbled.

In the audio recording, Dan greeted Grandfather. Dan next said, "Come here" and "Let's go." Jane asked where Dan wanted to go, and Dan stated he wanted to go to the elevator. Art said, "Do not come near me," "Please go," and "Do not come near me anymore." Dan started crying.

The audio recording captured Art telling Jane and Grandfather to "get out" and exclaiming Dan is his son. Several raised voices are heard. The officer then identified himself as "police," stated he saw the entire incident, and asked Art to sit down.

A-1860-22

Art also testified at trial. During his testimony, Art explained he became upset during parenting time exchanges because Dan referred to Grandfather as "Daddy." Art further stated he was scared and afraid of Grandfather. Art testified he repeatedly asked Jane to keep Grandfather outside the hotel lobby during parenting time exchanges.

Although Art testified Jane shoved him to the floor, the hotel's surveillance video showed otherwise.

Jane's attorney sought to play the hotel's surveillance footage during cross-examination of Art. However, counsel had not made any prior arrangement with the court to share the video evidence despite knowing Art was appearing virtually at trial. The judge advised Art would be unable to see the video because counsel had not made arrangements with the court's technical staff. Jane's attorney did not request an adjournment to make the necessary arrangements for Art to see the hotel's surveillance video. Understanding Art was unable to see the video, the judge explained he saw the video and would make "the final determinations" based on his review of that evidence. Even though Jane's attorney was unable to show the hotel's surveillance video to Art, her counsel cross-examined Art regarding Jane purportedly pushing him to the floor.

A-1860-22

Art also testified he called 9-1-1 on January 17 because he was "scared for [his] safety and [Dan's] safety." Art claimed he approached Jane and Grandfather because Dan "called" to him, and Art wanted to "pacify" his son. Art testified he "had zero intentions [to] go near [Jane] or [Grandfather]."

Following the testimony, the judge entered a February 8, 2023 order vacating both parties' TROs and dismissing both parties' domestic violence complaints. In his statement of reasons placed on the record, the judge declined to find "a predicate act by either party demonstrating that the other party ha[d] committed harassment." The judge explained:

> We have a version of what transpired by [Jane] as being different from the version of what transpired . . . according to [Art]. [Jane] says that during this interaction . . . she was hit in the chest, in the back. Of course[,] there's no . . . action for assault that's listed in her complaint for domestic violence, nor is there any mention at all about being struck in the chest or the back area. In addition, we have [Jane], when being asked, well, you were aware that [Grandfather] being present was an issue—and an extremely long pause on her part before . . . admitting that it did.
>
> I find that [Jane]'s testimony also at point[s] in time[] . . . was rambling and unresponsive to questions. The fact that she hire[d] a[n] . . . out-of-uniform officer for the exchange . . . and ha[d] her father present belies the fact of a fear of her husband. And I don't find her testimony to be credible on the issue of being able to establish that there was harassment committed upon her by [Art], in large part [because] there is also a

11

requirement that . . . the harassment [be] done with the purpose . . . to harass another.

The video shows the following. There's a dropoff. The child goes to [Jane].

And does [Art] go back to his hotel room? No. He goes in the opposite direction, toward[] . . . an elevator.

[Jane] has the child. Does she leave? No. She doesn't leave. She stays there.

And then [Grandfather]'s there as well . . . recording this, which speaks volumes of the intent . . . of [Jane] trying to get some information, perhaps, to be able to use . . . against her husband.

[W]e have the credibility of [Art], which goes completely out the window when his complaint for domestic violence says that . . . [Jane] shoved him with her shoulder, causing him to fall to the floor. It never happened. . . . And so I don't find [Art] to be a credible witness either so that I don't find that he has been able to demonstrate that there was harassment on the part of [Jane] . . . .

What we have and clear to the [c]ourt is a Peranio v. Peranio[9] issue of domestic contretemps between these parties . . . .

Because he determined Jane and Art lacked credibility, the judge found "[n]either party [could] obtain[] a final restraining order on harassment because neither party ha[d] proven harassment."

After Jane appealed, the judge issued a seven-page, single spaced, March 21, 2023 amplification of decision pursuant to Rule 2:5-1, supplementing his

---

9 280 N.J. Super. 47 (App. Div. 1999).

February 8, 2023 oral statement of reasons. In explaining his decision to forego further testimony regarding the parties' prior history of domestic violence, the judge wrote:

> As both parties failed to establish the presence of a defined predicate act [of harassment] through their [c]omplaints or testimony, this [c]ourt found it unnecessary to hear testimony on any prior acts of domestic violence. The parties were informed at the outset that the focus of the trial was going to be the predicate acts. Neither counsel objected to that directive. The [c]ourt has recently witnessed a movement by some litigants and attorneys to attempt to bootstrap a finding of [a] predicate act by relying heavily upon prior acts of domestic violence. This often follows a pattern of filing amendments to the Temporary Restraining Order and including a whole host of prior events going back over several years. Courts have a duty to promote efficiency and judicial economy. . . . Allowing testimony of the parties' extensive prior history would take time and would be counterproductive when the first element of [N.J.S.A.] 2C:25-17 had not been met.

The judge also explained "both parties were not credible for different reasons." The judge found "[Jane] added verbal testimony that was not included in her written [c]omplaint, while [Art] blatantly contradicted what was in his [c]ross-[c]omplaint with verbal testimony." After reiterating the statutory requirements for proving harassment, the judge stated Jane "did not provide

13

testimony establishing that [Art] committed harassment, let alone had the required purpose to harass her."

Additionally, the judge addressed Jane's allegation of disparate treatment by the judge during the trial. The judge allowed Art to appear at trial virtually because he lived in California. On the other hand, because Jane lived in New Jersey, the judge explained there was "no compelling reason as to why she could not appear in person, nor did she ask to appear virtually." Regarding periodic instructions to Jane's attorney to move on during direct examination of Jane, the judge explained he did so "when [Jane] began to monologue unnecessarily, straying from the answer to the question asked."

Further, the judge disputed Jane's claim he "ruled that there was no need to cross[-]examine [Art] on the video" from the hotel. The judge explained:

> [Art] was testifying on cross-examination to facts that were in direct contradiction to what was shown on the video . . . during [Jane]'s testimony. The video was shown on [Jane]'s attorney['s] laptop. Counsel wanted to show the video to [Art] by holding it up to the Zoom camera in the courtroom. The [c]ourt indicated that [Art] would not be able to see the video that way. [Jane]'s attorney wanted some other way to show the video, which the courtroom was unable to [support] at that time. . . . Had [Jane's attorney] notified the [c]ourt before the trial date that he wanted the ability to share his screen, arrangements could have been made to have his laptop connected on Zoom with [Art]. The [c]ourt never said there "was no need to cross[-]examine [Art]

14

on the video." Rather[,] it was said by the [c]ourt that[] "[Art] won't be able to see the video . . . [but the court] was able to see the video[,] and [the court would] be the one making a final determination."

In his written amplification, the judge reiterated:

> both parties failed to describe predicate acts that align[ed] with the statutory definition of harassment. As such, there was no need for the [c]ourt to continue on to an analysis of the second prong of the Silver test. This in addition to issues of credibility demonstrated by both parties led to the [c]ourt's decision to deny [f]inal [r]estraining [o]rders and instead dismiss both the [c]omplaint and [c]ross-complaint.

On appeal, Jane and Art contend the judge erred in precluding testimony regarding the prior history of domestic violence. Jane additionally argues she submitted sufficient proofs to support a finding of the predicate act of harassment, and the judge treated the parties differently during the trial. In his appeal, Art asserts his TRO should be reinstated and his domestic violence complaint be remanded to the Family Part if Jane's TRO is reinstated and her domestic violence complaint is remanded. We reject both parties' arguments.

Our review of a Family Part judge's decision is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). A Family Part judge's findings should be affirmed if supported by "adequate, substantial, [and] credible evidence." Id. at 411-12

(citing Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

We accord deference to Family Part judge's when the evidence is "largely testimonial and involves questions of credibility." Id. at 412. "[B]ecause it has the opportunity to make first-hand credibility determinations about the witnesses who appear on the stand[,] [the trial court] has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)).

We may reject the Family Part judge's findings only if "we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant, and reasonably credible evidence as to offend the interests of justice." R.G. v. R.G., 449 N.J. Super. 208, 218 (App. Div. 2017) (quoting Cesare, 154 N.J. at 412). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference" and are reviewed de novo. Crespo v. Crespo, 395 N.J. Super. 190, 194 (App. Div. 2007) (alteration in original) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

The purpose of the PDVA is to "'assure the victims of domestic violence the maximum protection from abuse the law can provide.'" G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)); see also N.J.S.A. 2C:25-18. The PDVA is "intended to address matters of consequence, not ordinary domestic contretemps." Peranio, 280 N.J. Super. at 57.

A party seeking protection under the PDVA must prove the allegations in the domestic violence complaint by a preponderance of the evidence. N.J.S.A. 2C:25-29(a). Among the factors to be considered under the PDVA, judges "shall consider . . . [t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse." N.J.S.A. 2C:25-29(a)(1).

When a Family Part judge considers whether the entry of an FRO is appropriate, the judge must first "determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006). The judge should construe any such acts in light of the parties' history to better understand the totality of the circumstances of the relationship and give context to otherwise ambiguous behavior. See J.D.

v. M.D.F., 207 N.J. 458, 479 (2011). Not every bothersome, offensive, or rude behavior rises to the level of domestic violence. Id. at 483. Accordingly, Family Part judges "have been specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples, and . . . [because of that expertise,] their findings are entitled to deference." Id. at 482. "In performing that function, 'the [PDVA] does require that acts claimed by a plaintiff to be domestic violence . . . be evaluated in light of the previous history of violence between the parties.'" Silver, 387 N.J. Super. at 125-26 (quoting Cesare, 154 N.J. at 402).

Second, the judge must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." Id. at 127.

Here, the judge did not consider the parties' prior history of domestic violence in evaluating the evidence of harassment. However, counsel for the parties failed to object to the judge's statement that he would first hear testimony on the predicate act and, if either party proved a predicate act, would then consider evidence of prior incidents of domestic violence. Because counsel did not object, we review for plain error under Rule 2:10-2. Under the plain error

standard, we will reverse only if the error is "of such a nature as to have been clearly capable of producing an unjust result." R.G., 449 N.J. Super. at 220 (quoting State v. Green, 447 N.J. Super. 317, 325 (App. Div. 2016)).

In her domestic violence complaint, Jane alleged Art's conduct constituted harassment. Harassment is defined as follows:

> [A] person commits a petty disorderly persons offense if, with purpose to harass another, he:
>
> a. Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4.]

Having reviewed the record, even if the judge considered the prior history of domestic violence, we are satisfied the prior incidents identified in Jane's domestic violence complaint could not support a finding of harassment under N.J.S.A. 2C:33-4. None of the prior incidents stated in Jane's domestic violence complaint established Art's purpose to harass, as required under the statute. Nor did any of the prior incidents evidence that Art engaged in any conduct

prohibited by the harassment statute. Jane's complaint was devoid of evidence of communications that would have satisfied N.J.S.A. 2C:33-4(a). In addition, there was no proof Art offensively touched Jane consistent with N.J.S.A. 2C:33-4(b). Further, none of the prior incidents in Jane's domestic violence complaint bore any relevance to harassing conduct under N.J.S.A. 2C:33-4(c). Although the judge erred in excluding testimony regarding the parties' history of domestic violence, there was no plain error in his decision to do so under these specific facts.

Similarly, we are satisfied none of the prior domestic violence incidents alleged in Jane's complaint established Art acted with the purpose to harass her on January 17, 2023. Not a single prior incident supported Jane's assertion that Art's conduct on January 17, purportedly pushing Grandfather to remove Dan from Grandfather's arms, was done with the purpose to harass Jane.

As we previously describe, the record is devoid of any credible evidence that Art struck, kicked, shoved, or offensively touched Jane on January 17 consistent with N.J.S.A. 2C:33-4(b). While Jane alleged Art "shoved" her, the judge found Jane's testimony not credible and belied by the hotel's surveillance video.

We defer to the judge's credibility determinations and his factual findings based on the trial testimony and the hotel's surveillance video admitted as evidence during the trial. See State v. S.S., 229 N.J. 360, 374-81 (2017) (stating the deferential and limited scope of appellate review of factual findings based on video evidence). The judge watched the hotel's surveillance video footage and concluded Art never shoved Jane. Rather, the undisputed video evidence showed Art rush toward Grandfather and Jane deliberately positioned her body between Art and Grandfather. The video evidence also corroborated the officer's trial testimony that Jane purposely inserted herself between Art and Grandfather.

The hotel surveillance video was clear, and the events depicted in the video were unequivocal. As such, the judge did not require the parties' alleged history of domestic violence to determine whether Art's conduct on January 17 constituted harassment.

Under the idiosyncratic facts in this matter, we discern no basis to question the judge's credibility determinations. Based on the parties' testimony and other trial evidence, no reasonable factfinder could conclude either party committed a predicate act of harassment under N.J.S.A. 2C:33-4 on January 17, 2023. Applying the plain error standard under Rule 2:10-2, the judge's decision to proceed in this manner did not produce an unjust result.

To the extent we have not addressed any of the parties' remaining arguments, we are satisfied such arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1860-22