# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1083-24
                A-1084-24

M.G.,[1]

       Plaintiff-Respondent,

v.

J.A.L.,

       Defendant-Appellant.

_____

J.A.L.,

       Plaintiff-Appellant,

v.

M.G.,

       Defendant-Respondent.

_____

Argued November 13, 2025 – Decided December 8, 2025

Before Judges Mawla and Marczyk.

---

[1] We use initials to protect the identities of the parties. R. 1:38-3(d)(10).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket Nos. FV-01-0915-25 and FV-01-0923-25.

Eric R. Foley argued the cause for appellant (Law Office of Louis Guzzo, attorneys; Eric R. Foley, on the briefs).

Respondent has not filed a brief.

PER CURIAM

In these one-sided appeals, argued back-to-back, and consolidated for disposition in a single opinion, appellant J.A.L.[2] challenges the December 12, 2024 final restraining order (FRO) entered against him in favor of respondent M.G. and the court's order of the same date denying his request for an FRO against M.G. under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. We vacate and remand for a new trial in both matters.

## I.

The parties are married with four children. On December 1, 2024, J.A.L. obtained a temporary restraining order (TRO) against M.G. In his complaint, he alleged M.G. had harassed him by "confront[ing] him about cheating on her" and "screaming at [him] and following him around the house as he was trying to

---

[2] J.A.L. is the defendant in A-1083-24 and the plaintiff in A-1084-24. For ease of reference, we refer to the parties by their initials.

stay away from her."  J.A.L. further alleged he "asked [her] several times to leave him alone, however[,] she continued to follow him around . . . [and] began to throw several of [his] personal belongings around the house."  He also claimed M.G. "has made threats to harm his coworkers and  . . . has shown up to his workplace . . . to create a scene and get him fired."  J.A.L.'s complaint noted the parties had a history of reported domestic violence.

On December 3, 2024, M.G., in turn, was granted a TRO against J.A.L. In her complaint, she alleged J.A.L. had assaulted and harassed her, explaining he had "smacked her in the face[,] causing bleeding[,] approximately two weeks ago," and had assaulted and harassed her on several other occasions.  M.G. also alleged J.A.L. has thrown various items of hers on the ground, "gets intoxicated and acts out," "bothers her at her place of employment[,] and contacts her coworkers."  She further asserted the parties had a history of reported domestic violence, including "multiple . . . cases of simple assault and harassment."

The FRO hearings took place on December 12, 2024.  The parties were self-represented, and the court heard both matters at the same time.  Prior to commencing the trials, the court advised both parties:  "So what's going to happen[ is] I'm going to ask you both questions.  You'll both tell me about the events -- your version of events.  Each party will have the right to question the

other party through cross-examination."  The court asked each party if they had any witnesses they wished to call, but it did not advise the parties of the negative ramifications that could arise if an FRO was entered against them, or inform them of their right to retain counsel.

A.    A-1084-24

The court first heard J.A.L.'s complaint.  J.A.L. testified that on December 1, 2024, he arrived home from work at approximately 12:00 p.m. to M.G. "screaming at the top of her lungs" at him as soon as he walked through the door. M.G. followed him upstairs, and then outside, while he was trying "to get away from her."  J.A.L. stated he eventually went back inside their home because he did not want their neighbors to hear her screaming.  Once back inside, he claimed M.G. continued to follow him throughout the house, "throwing stuff . . . out the window" and "slamming stuff on the floor" while still "screaming at the top of her lungs."

J.A.L. also testified M.G. spit on him "[s]everal times" while she was screaming at him.[3]  The court reviewed four videos taken by J.A.L., which he

---

[3]  The court noted J.A.L.'s original complaint did not allege M.G. spit on him. It found his complaint had been amended, but it was unclear whether his amended complaint contained the spitting allegation.  The court did not appear to have a copy of J.A.L.'s amended complaint, although it noted it was amended

claimed corroborated his testimony and showed M.G. harassing and spitting on him during the confrontation. J.A.L. further recounted M.G. had harassed him at his workplace and submitted text messages to the court purportedly demonstrating he had asked her to stop contacting him there. When asked by the court whether he believed he needed an FRO for his safety and to prevent further domestic violence, J.A.L. answered "[o]f course."

M.G. asserted J.A.L.'s version of what happened on December 1 was "not entirely honest." She recalled sitting in the living room watching television when he came home from work that day "angry," asking her "[w]hat the f**k have you been doing all day?" M.G. explained she told J.A.L. she had been cleaning, doing laundry, fixing the house, and had just asked their kids "to help [her] with the [Christmas] tree." She claimed J.A.L. had put his beers away when he got home, noting "he drinks beer non-stop, six to ten tall cans a day." M.G. also stated she never knows what mood J.A.L. will be in when he gets home.

M.G. recalled J.A.L. came upstairs a couple of hours later, asking her "[w]hat the f**k are you doing, b***h?" She asserted she had no idea what had

___

on December 4, 2024, and suggested the relief sought and "the entire history" had been amended. The record also does not reflect whether M.G. was served with, or had notice of, J.A.L.'s amended complaint.

A-1083-24

happened downstairs to make him angry with her. In response to her asking him what had happened, M.G. claimed J.A.L. called her "a piece of s**t" and "a f***ing b***h." She acknowledged she "just lost it" at that point, explaining:

> Every time I talk to this man, he's drunk. He's mad. I'm not allowed to ask questions. I'm not allowed to talk to anybody. I'm restrained from doing anything in the house. If he comes upstairs from drinking his beers, I get some type of mo[od], and I have to be defensive.

M.G. explained J.A.L. then ran around the house while she was "asking him to stay in the room to talk," which was when he started filming on his phone. She testified she did not "remember ever . . . spitting at [J.A.L.] while talking to him" during the December 1 incident. However, M.G. admitted she "did throw away his beer because he kept buying more."

B.    A-1083-24

The court next heard M.G.'s complaint. M.G. testified J.A.L. had hit her in the face two weeks prior to filing her complaint. She recalled they were arguing at the time, and J.A.L. was drunk. M.G. explained she had been asking J.A.L. questions when he told her to "[s]hut the f**k up" and "smacked" her. She also claimed he had also hit her on "countless" other occasions.

6

The court reviewed M.G.'s proffered photographic evidence in support of her claim she sustained injuries from J.A.L. hitting her.[4] It noted one picture showed M.G. with an arm injury, which she confirmed J.A.L. caused. The court found another photo showed her with a bloody nose, which M.G. explained resulted from J.A.L. hitting her in the face one day when she tried to hide his beer. Two more photos showed M.G. with another bloody nose from 2021, which she explained was from J.A.L. hitting her during an argument. The court noted other photos depicted injuries to her hands, eyebrow, arms, lip, and foot, which M.G. maintained J.A.L. caused during various other incidents.

M.G. also asserted J.A.L. keeps a gun in their house and "has threatened to use [it] on [her]," providing the court with a photo of the alleged gun. She also testified J.A.L. broke the front door of their house in December 2023 by kicking it when she locked him outside; she provided the court with photos of the alleged property damage. M.G. further claimed that in November 2022, J.A.L. took her car and drove it into a ditch while he was searching for their

---

[4] J.A.L. contends M.G. failed to turn over those photo exhibits when requested to file his appeal. We also note that, although the court treated the photos presented by M.G. and the videos submitted by J.A.L. as if they were in evidence, it never formally moved those items into evidence, despite noting M.G.'s photos were in evidence during its oral decision. On remand, the court should clearly determine on the record which exhibits are admitted into evidence to preserve the record for appeal.

A-1083-24

daughter, who had run away after an argument with him. The court noted the car incident was not alleged in her December 3 complaint, however, M.G. informed the court she had amended her complaint to include it.[5] Although the record reflected she filed an amendment on December 5, the court did not have the amended complaint before it and could not tell exactly what had been amended. The court nonetheless allowed M.G. to testify about the alleged damage J.A.L. caused to her car.

M.G. further claimed J.A.L. keyed her car in April 2023 after she accused him of cheating on her; she provided the court with photos showing the alleged damage. She also stated J.A.L. has a "history of violence and alcoholism," and she is the primary caretaker of their children. M.G. also called her mother as a witness, who testified briefly regarding her knowledge of a time M.G. had to call the police after J.A.L. assaulted her. When asked by the court whether M.G. needed an FRO for her safety and to prevent further domestic violence, M.G. answered "yes."

---

[5] M.G. explained she did not come to court and sign an amended complaint in-person because she "had to stay somewhere safe while away" and instead "emailed it to [the court staff]." We note the gun allegation and damage to the door of the home were also not mentioned in M.G.'s initial complaint.

A-1083-24

J.A.L. denied "everything" M.G. alleged. When asked by the court who caused the injuries contained in M.G.'s photo exhibits, he responded M.G.'s injuries "could have been [caused by] anybody" or even M.G. herself. J.A.L. admitted he was arrested eighteen years ago for domestic violence but stated "since then, nothing." He claimed M.G. told him her car had been keyed at a Walmart, but he admitted to breaking the door of their home. Regarding the November 2022 car incident, J.A.L. asserted M.G. knew he was taking her car to search for their daughter and explained it had gotten stuck in the mud during his search; he claimed there was no damage to her car and asserted she filed a fraudulent insurance claim.

C.    The Court's Rulings

Following the parties' testimony, the court rendered oral rulings in both matters. Regarding J.A.L.'s complaint, A-1084-24, the court found J.A.L.'s video exhibits showed the parties arguing, including M.G. screaming at him, following him around the house, and throwing things. It further found the videos reflected J.A.L. telling M.G. to "[s]top spitting at [him]," but observed the spitting "wasn't on . . . video," and noted it could not tell whether "any . . . spit came of her mouth." Accordingly, the court determined M.G.'s acts did not constitute harassment based on J.A.L.'s testimony and its review of the video

footage. It reasoned daily "stresses, arguments, screaming, and yelling[] do[] not constitute harassment," but instead "domestic contretemps." Thus, the court concluded M.G. committed no act of domestic violence, denied J.A.L.'s request for an FRO, and dismissed the TRO against M.G.

Turning to M.G.'s complaint, A-1083-24, the court similarly found her allegations did not support a finding of harassment. However, regarding her assault allegation, it noted the twenty photographs she presented to the court showed various injuries she alleged J.A.L. caused, including "to her arm, her nose, her face, her eye, her eyelids, her legs, her feet, [and] her hands." The court found J.A.L. to be "dismissive" and "flippant" in stating anyone could have caused those injuries, explaining it had a "hard time believing that those types of injuries [were] caused through self[-]infliction." The court determined M.G.'s testimony J.A.L. caused the photographed injuries was credible.[6] Accordingly, it concluded M.G. "established the predicate act of assault under [N.J.S.A.] 2C:12-1." It further found she established a need for an FRO to prevent further acts of domestic violence, reasoning J.A.L. admitted to prior domestic violence,

---

[6] The court referenced M.G.'s photos being in evidence at this point, stating: "The injuries are apparent and evidence[d] by all those pictures[,] which are entered into evidence."

there have been prior domestic violence complaints, and M.G. felt endangered. The court entered an FRO against J.A.L.

## II.

On appeal, J.A.L. argues the court erred in denying his request for an FRO because it incorrectly concluded the video evidence was unclear as to whether M.G. spit on him, which requires reversal and a new trial. Regarding the entry of the FRO against him, J.A.L. asserts his due process rights were violated because the court did not advise him of his right to retain counsel, he was never served with M.G.'s amended complaint, and M.G. testified regarding matters not set forth in her original complaint. He further asserts the court misapplied the prevailing legal standards under the PDVA.

Our scope of review of Family Part orders is limited. C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). We owe substantial deference to the Family Part's findings because of its special expertise in family matters. Cesare v. Cesare, 154 N.J. 394, 413 (1998). We must "accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" C.C., 463 N.J. Super. at 428 (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). That deference is

11

particularly strong when the evidence is largely testimonial and rests on a judge's credibility findings. Gnall v. Gnall, 222 N.J. 414, 428 (2015).

We will not disturb a trial judge's factual findings unless "they are so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we do not accord such deference to legal conclusions and review such conclusions de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

The purpose of the PDVA is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)); see also N.J.S.A. 2C:25-18. The PDVA authorizes judges to issue an FRO against a person "after a finding . . . is made that an act of domestic violence was committed by that person." N.J.S.A. 2C:25-29(a).

"In adjudicating a domestic violence case, the trial judge has a 'two-fold' task." J.D. v. A.M.W., 475 N.J. Super. 306, 313 (App. Div. 2023) (quoting Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006)). "The judge must first determine whether the plaintiff has proven, by a preponderance of the

evidence, that the defendant committed one of the predicate acts referenced in N.J.S.A. 2C:25-19(a)." Ibid.

Should a plaintiff prove a predicate act was committed, the second inquiry is whether the judge should enter an FRO "to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127. While the second inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(]a[)](1) to -29[(]a[)](6)." Ibid.

A.

J.A.L. argues the court erred in finding his video footage did not show M.G. spitting on him and therefore asserts its dismissal of his TRO should be reversed and the matter remanded for a new trial. He contends no deference should be given to the trial court's finding the spitting "wasn't on . . . video" because "[t]he video evidence . . . is clear and unequivocal" in showing M.G. spit on him. J.A.L. claims this finding led the court to erroneously determine he had not proven the predicate act of harassment because it "then only focused on [his] allegation that [M.G.] followed [him] around the house and yelled" at him, which the court perceived as "domestic contretemps." Accordingly, he contends the record "plainly establishe[d] a basis for harassment as a predicate act" under

13

any portion of N.J.S.A. 2C:33-4. He asserts the court's erroneous finding—that he could not establish the predicate act of harassment—diminished its analysis of whether a restraining order was necessary to protect him from immediate harm or further acts of violence under the second prong of Silver.

N.J.S.A. 2C:33-4 provides "a person commits a petty disorderly persons offense if, with [the] purpose to harass another," they:

> a. Make[], or cause[] to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subject[] another to striking, kicking, shoving, or other offensive touching, or threaten[] to do so; or
>
> c. Engage[] in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

The court must exercise care "to distinguish between ordinary disputes and disagreements between family members and those acts that cross the line into domestic violence." R.G. v. R.G., 449 N.J. Super. 208, 225 (App. Div. 2017). The PDVA is not intended to encompass "ordinary domestic contretemps." Corrente v. Corrente, 281 N.J. Super. 243, 250 (App. Div. 1995). Rather, it "is intended to assist those who are truly the victims of domestic

14

violence." Silver, 387 N.J. Super. at 124 (quoting Kamen v. Egan, 322 N.J. Super. 222, 229 (App. Div. 1999)).

Our review of video evidence is deferential. State v. S.S., 229 N.J. 360, 379 (2017). Accordingly, a trial court's finding based on video evidence can only be reversed on appeal if its interpretation was "so wide of the mark . . . that the interests of justice demand intervention." Id. at 381; see also State v. Elders, 192 N.J. 224, 245 (2007).

Notwithstanding the deference we owe to the trial court's interpretation of J.A.L.'s video evidence, we conclude the court erred in its review and analysis of the subject footage. Our review of the videos introduced at trial show M.G. spitting at J.A.L. We are mindful of the fact the court was interrupted several times during the proceedings, including by a recess to address a separate matter that required an interpreter with limited availability. We surmise those disruptions distracted the court from fully reviewing each of the videos. Regardless of the reason for the oversight, the court's finding the videos did not depict M.G. spitting is unsupported by the footage. Had the court observed this spitting, it could have impacted its assessment of whether M.G. committed a predicate act of harassment. Accordingly, we are constrained to remand for a

A-1083-24

new trial. However, our decision to remand this matter shall not be construed as an expression of an opinion regarding the ultimate merits of J.A.L.'s claim.

B.

J.A.L. also argues the court: (1) failed to authenticate and formally move the parties' exhibits into evidence; (2) violated his due process rights by failing to ensure he was on notice of M.G.'s amended complaint and by failing to inform him of his right to retain an attorney; and (3) misapplied the two Silver prongs in granting M.G. an FRO. Thus, he contends the FRO entered against him in favor of M.G. should be reversed and the matter remanded for a new trial. We confine our discussion to J.A.L.'s due process arguments.

J.A.L. asserts there is no evidence in the record suggesting he was ever served with M.G.'s amended complaint or even knew she had amended her complaint. He argues the trial court should have protected his due process rights by ensuring he was aware of her amended complaint and had been served with it; emphasizing the court itself was not aware M.G. had filed an amended complaint. J.A.L. further claims the court allowed M.G. to present evidence of allegations not pled in her original complaint, of which he had no notice, including "numerous past allegations of assault, allegations . . . [he] damaged her car[,] and allegations that [he] damaged the house." He avers the court

16

should have offered him an opportunity for an adjournment to allow him to prepare for M.G.'s new allegations.

More fundamentally, J.A.L. argues the "speed and manner" in which the case was heard further compounds the court's violation of his due process rights. He contends the court initiated the trial "without first advising the parties of their right to retain counsel" and without seeing if the parties were ready to proceed.

"[O]rdinary due process protections apply in the domestic violence context, notwithstanding the shortened time frames for conducting a final hearing . . . ." J.D., 207 N.J. at 478. To "ensur[e] that defendants are not deprived of their due process rights requires our trial courts to recognize both what those rights are and how they can be protected consistent with the protective goals of the [PDVA]." Id. at 479. In this context, due process requires defendants be given "a meaningful opportunity to defend against a complaint." D.N. v. K.M., 429 N.J. Super. 592, 606 (App. Div. 2013).

While due process does not guarantee the appointment of counsel in the context of the PDVA, it does require that defendants understand their "right to retain legal counsel" and that they "receive[ ] a reasonable opportunity to retain an attorney." A.A.R. v. J.R.C., 471 N.J. Super. 584, 588 (App. Div. 2022).

A-1083-24

PDVA defendants must have "the opportunity to seek legal representation, if requested," and whether they are given such an opportunity is based on a "fact-sensitive" analysis. D.N., 429 N.J. Super. at 606.

Given the substantial adverse outcomes defendants face in domestic violence proceedings, we must consider whether defendants have been made aware of the consequences that flow from entry of an FRO against them. Certain mandatory sanctions are imposed upon an FRO's entry, such as fingerprinting, N.J.S.A. 53:1-15, and inclusion in a central registry, N.J.S.A. 2C:25-34. A defendant subject to an FRO is also prevented from "purchasing, owning, possessing[,] or controlling a firearm." N.J.S.A. 2C:25-29(b). In addition to mandatory sanctions, the issuing court has the discretion to impose further conditions "impairing a defendant's interests in liberty and freedom in order 'to prevent further abuse.'" A.A.R., 471 N.J. Super. at 588 (quoting Peterson v. Peterson, 374 N.J. Super. 116, 124 (App. Div. 2005) (quoting N.J.S.A. 2C:25-29(b))). As such, "due process also requires trial courts to apprise domestic violence defendants, in advance of trial, of the serious consequences should an FRO be entered against them." Ibid.

We conclude J.A.L. was denied the relevant due process protections required under the PDVA. He was not advised of his right to retain counsel.

The court also did not properly advise the parties regarding the significant adverse outcomes defendants may face in domestic violence proceedings.[7] Accordingly, we vacate the FRO entered against J.A.L. and remand for a new trial. Given our decision, we need not address J.A.L.'s substantive arguments, except as briefly noted below.

Because there was some procedural confusion before the trial court regarding which complaints had been filed or served, and disputes with respect to whether the parties set forth all of their allegations in their complaints, on remand, the parties shall ensure the entirety of their allegations are set forth in their amended complaints. If necessary, the parties shall file amended complaints within thirty days of this opinion, and the trial shall be promptly scheduled thereafter. Further, the court shall confirm prior to trial that it has in its possession the most recent amended complaints from both parties, and, equally important, ensure the amended complaints have been properly served on the parties so they are both on notice of the claims being asserted against them before any retrial.

For the reasons set forth above, we vacate the FRO entered against J.A.L. in favor of M.G. and reinstate the TROs for both J.A.L. and M.G., pending

---

[7] On remand, proper instructions should be given to both parties.

A-1083-24

further order of the trial court. Finally, because the judge made credibility findings based on a mistaken review of the video evidence, the judge may be perceived as committed to their original conclusions. Therefore, it is appropriate for us to assign the case to a different trial judge. See R.L. v. Voytac, 199 N.J. 285, 306 (2009) (finding it "appropriate" to assign the remanded matter to a different trial judge "[b]ecause the trial court previously made credibility findings"); Penbara v. Straczynski, 347 N.J. Super. 155, 163 (App. Div. 2002) (requiring a different judge to hear a retried case where the trial judge "may have a commitment to [their] original perception of the [witness]'s credibility," which was based on an erroneously limited evidentiary record).

Reversed and remanded in A-1083-24 and A-1084-24. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division